Virgil John ETCHIESON, Appellant,

v.

The STATE of Texas, Appellee.

No. 53167.

Court of Criminal Appeals of Texas, En Banc.

Nov. 1, 1978.

Rehearing Denied Nov. 29, 1978.

---

Emmett Colvin, Dallas, for appellant.

Henry Wade, Dist. Atty., W. T. Westmoreland, Jr., Gerald A. Banks, Jon Sparling and Kelly W. Loving, Asst. Dist. Attys., Dallas, for the State.

## OPINION ON APPELLANT'S MOTION FOR REHEARING

DOUGLAS, Judge.

Virgil John Etchieson appeals from his conviction for the offense of aggravated promotion of prostitution, as denounced by V.T.C.A., Penal Code, Section 43.04. The jury assessed punishment at ten years' confinement and a $5,000.00 fine. The judgment was affirmed in a prior per curiam opinion 549 S.W.2d 409.

The record shows that appellant was engaged in running a "call-girl" type operation from his lakehouse on Lake Dallas. The instant offense is alleged to have occurred on December 18, 1974. He was arrested on December 20, 1974 at the time of the execution of a search warrant by officers at his lake home on that date.

One of the rooms in his home was used as an office. It contained, among other things, telephones, recording equipment, and automatic answering devices. Also found in the room was a "trick list" described by officers as a list of potential or actual customers for prostitutes. The list was also coded to reflect such information as wife answers the phone, nosey secretary, "gear", check good and don't take check. It also contained the names of almost fifty available prostitutes. A customer could obtain the services of one of the prostitutes through the use of an escort service. A customer would call the listed number of the operation and the automatic answering service would tell the caller to leave his name and telephone number and he would be called back. Prior to being called back, the customer's name would be checked against the "trick list" and if all was in order the call would be returned and a date made. A prostitute would then be sent to fulfill the commitment. Each return call reflected was shown to have been made by Pamela Lou Wood, also known as "Cyn."

The events leading to appellant's arrest and exposure of his operation were brought about by the cooperation of a prostitute named Frances Witherspoon and a police informer named Jimmy Hopgood with officers of the Dallas Police Department's vice squad.

The initial contact with appellant's operation was established on December 8, 1974, by Sergeant D. F. Fowler through Witherspoon, who was also known as "Sabrina." Witherspoon placed a call to Wood on appellant's unlisted telephone number, 231-9061, and told Wood that she had a trick that she was unable to service because of a recent abortion and requested that she take care of him. Wood assured Witherspoon that he would be taken care of because she had vouched for him. The name of Sam Williams was given to Wood, an alias used by Hopgood.

On December 10, 1974, a date was arranged for Hopgood using the name Williams through Wood at the Ramada Inn Convention Center in Dallas. Deborah Walker, known as Sandy, kept the date and accommodated Hopgood.

Shortly thereafter, Fowler had a series of conversations with Wood using Hopgood's alias. It was during these conversations that Fowler arranged a party involving the seven prostitutes who were arrested on December 18, 1974, at a hotel in Dallas. Fowler had told Wood that there was to be a MasterCharge seminar held at the hotel and it was his desire to give a Christmas party for the seven men attending. Wood agreed that seven girls would be furnished and that the girls would provide a lesbian-type show first and then each of the men would

have sexual intercourse with one of the prostitutes.

Through the use of fellow police officers and a few cooperating civilians, Fowler was able to assemble six men at the designated hotel room. The women began arriving individually at nine o'clock p. m. Upon arrival they all undressed and began performing their show. Fowler, in order to make his case against the women involved, stopped them and had the women pair off with the men before continuing the show. Each woman was then paid the agreed price of $200 for her services. Fowler, who had a radio taped to his body, then transmitted a pre-arranged signal to officers waiting in a room across the hall. The officers entered and arrested all seven of the prostitutes. The names of all seven prostitutes were found in appellant's files at his office in his lake home.

On the basis of this information as well as other information Sergeant Roger Duncan, also of the vice squad, filed an affidavit which was used to obtain a search warrant from the Honorable Robert L. Sparks of Denton County to be executed on appellant's lake home. Appellant and Wood were both arrested at the time the warrant was executed.

Initially, appellant contends that the trial court erred in failing to require the State to disclose the identity of the informant. At the hearing on appellant's motion to disclose the informant's identity, Sergeant Fowler testified that prior to the arrest of the seven prostitutes at the hotel on December 18, 1974, he had discussed arrangements for the party with Pamela Wood by calling her at 231–9061 on three occasions and again a fourth time on the day of the party. He related that on December 18, 1974, he met with Sergeant Duncan near a pay telephone on Harry Hines Boulevard. Someone was with Duncan, but that person did not have anything to do with or play any part in making the arrangements for the seven prostitutes to come to the hotel to the alleged Christmas party on that evening. Fowler further testified that he had no idea that anyone would be with Duncan when they had arranged to meet that afternoon.

However, it did not matter whether or not Duncan had anyone with him. After he had placed the fourth call to Wood and given her the room numbers at the hotel where the girls were to go, he told Duncan the substance of his telephone conversation in a quiet manner so that it could not be heard by the individual who was with him. Fowler also testified that the person who was with Duncan was not present at the time the seven prostitutes were arrested at the hotel. To his knowledge that individual was nowhere near the hotel. Fowler emphasized that all of the events leading up to having the girls sent to the hotel on the night of December 18, 1974, were done without any help whatsoever or any effort on the part of the person who was with Duncan the afternoon of December 18. He also admitted that he knew who the person was, that he feared for the person's life if required to disclose his identity. "The man with Roger Duncan had nothing to do whatsoever with the entire set up of this party in any way."

Likewise, Sergeant Duncan testified that he himself had not been involved in any way with helping Sergeant Fowler arrange the party and that the confidential informant who had given him his information had been working with him in attempting to clear up the prostitution activities of appellant. Their efforts were being made simultaneous with efforts by Fowler. Duncan stated that he had not told his informant anything about Fowler's attempts to set up a party with the prostitutes through appellant or Pam Wood. He acknowledged that his informant had been with him on the afternoon of December 18, 1974, but stated that it had not been pre-arranged that he and Fowler and the informant meet jointly. He stated that during the course of Fowler's conversation with Wood on the afternoon of December 18 he was close enough to Fowler to overhear Fowler's portion of the conversation but his informant was a few feet away from him on the other side and that when Fowler had completed his conversation he informed only him and

not the informant of the full gist of the conversation. Once Fowler's conversation had been completed, Fowler departed and Duncan and his informant left to go their separate way. Duncan also testified that he was present that night at the hotel and had actually participated in the arrest of the seven prostitutes there but that his informant was not present. When questioned about the statement in his affidavit, "On December 18, 1974, the informant and an undercover agent of the Dallas Police Department called 231–9061 and requested seven (7) females for prostitution purposes to be sent to their hotel," Duncan related that what he meant was that the informant was present at the time Fowler made the call but that Fowler had made the call personally and did not know the purpose of the call nor to whom Fowler was talking. Further, the reference to "their hotel" in the affidavit was the " . . . hotel that Sgt. Fowler had prearranged and the other undercover officers working with Sgt. Fowler."

In his brief, appellant quotes from *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639, wherein it was written:

"We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informant's testimony, and other relevant factors."

However, the Court also wrote:

" . . . The purpose of the privilege (informant's privilege) is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law enforcement officials and, by preserving their anonymity, encourages them to perform that obligation."

The identity of an informant need not be disclosed unless (1) the informant participated in the offense; (2) was present at the time of the offense or arrest; (3) was otherwise shown to be a material witness to the transaction or as to whether appellant knowingly committed the act charged. *Carmouche v. State,* 540 S.W.2d 701 (Tex. Cr.App.1976), and cases cited therein. In the instant case the informant was not present at the time appellant was arrested nor was the informant a participant in the offense. Appellant contends, however, that the informant could be a material witness as to whether or not Duncan relied on credible information in making his affidavit. He argues that the statement in the affidavit wherein Duncan talks about the telephone call made by Fowler on December 18, 1974, is sufficient to show the informant's participation in the offense. Appellant relies upon *James v. State,* 493 S.W.2d 201 (Tex.Cr.App.1973). In *James,* the informant brought the defendant and the undercover agent together and was present when the sale of the marihuana was consummated. The informant in the instant case was neither present at the time the prostitutes were arrested nor did he initiate or participate in establishing initial contact or making arrangements with appellant for the prostitutes to be present at the hotel on December 18, 1974. The *James* case is not applicable. See also *Carmouche v. State,* supra.

Appellant next contends that the search warrant was invalid. Hearings on the motion to suppress evidence were held on April 4, April 18 and April 25, 1975. We conclude that trial court properly overruled the motion for reasons which follow.

He argues that the affidavit was insufficient to establish probable cause. Under *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), the affidavit must contain (1) the underlying circumstances which led to the informant's conclusion of guilt, and (2) the underlying circumstances which led the affiant to believe that the informant was credible and reliable.

The affidavit in the instant case contains more than enough information to satisfy both prongs of the *Aguilar* test. This affidavit, dated December 20, 1974, reads as follows:

"MY BELIEF OF THE AFORESAID STATEMENT IS BASED ON THE FOLLOWING FACTS:

"I have been informed of the foregoing set out facts by a person whom I know to be reliable, credible and trustworthy, who states the following facts: I, the affiant, received information from a confidential informant on numerous occasions, most recently on December 16, 1974, that Virgil John Etchieson is operating a prostitution enterprise from the above mentioned location. The informant stated that he visited the location on December 16, 1974, and observed Virgil John Etchieson discussing the price for a date of prostitution with an unknown date. The informant also stated that books containing names and telephone numbers of male persons were referred to when male persons called Virgil John Etchieson requesting dates of prostitution. Virgil John Etchieson is a known pimp and character and has been convicted for procuring and prostitution offenses in the past. I, the affiant, have received information from this informant in the past on at least five different occasions and on each occasion the information proved to be reliable, true, and correct. On December 17, 1974 I, the affiant, observed the informant call 231–9061, a phone number registered to Virgil John Etchieson at the above mentioned address, and request a date of prostitution. A female answered the call and described herself as 'a red-headed girl called Sin', and she agreed to send the informant a woman to fill a straight date of prostitution for the sum of $50.00. The informant stated that the prostitute did in fact meet him and filled a date of prostitution with him for the sum of $50.00. On December 18, 1974, the informant and an undercover officer of the Dallas Police Department called 231–9061 and requested seven (7) females for prostitution purposes be sent to their hotel. The female known only as 'Sin' again answered the call and stated that she would send seven (7) prostitutes to their location to perform straight dates, french dates, and show dates of prostitution for the sum of $200.00 for each prostitute. The prostitutes did in fact come to the designated location and did agree to the above described dates of prostitution, were paid by the undercover officer and then arrested for Violation Section 43.02 (Prostitution) of the Texas Penal Code. The phone number called on each occasion is registered to Virgil John Etchieson the known pimp. The information on who the telephone is registered to was obtained after Dallas Police Department Officers obtained a court order to get the information. The informant's information has always been reliable, true, and correct."

Appellant asserts the search warrant was invalid because it was based on intentional misrepresentations by the affiant, Officer Duncan. The alleged misrepresentations center on Duncan's testimony at the hearings on the motions to suppress and to disclose the identity of the informant.

The record shows that Judge Sparks questioned Duncan about the affidavit prior to issuing the search warrant. Much of Duncan's testimony was the same testimony which has been set out in the discussion of appellant's first ground of error.

■ The judge had before him evidence from which he could conclude that the informant was not present at the time of the arrests on December 18 and 20, and that he was not a material witness in any respect. While there appear to be some minor discrepancies between Duncan's testimony and the facts set forth in the affidavit, the record before us supplies no basis for a determination that the search warrant was based upon intentional misrepresentations by the affiant. The judge was the sole judge of the credibility of the witnesses and the facts at the pretrial hearings. See *Draper v. State*, 539 S.W.2d 61 (Tex.Cr.App. 1976). He observed Duncan's demeanor

and the manner in which he testified and determined that the affidavit was valid. No error is shown.

■ Nor do we find merit in appellant's attack on the sufficiency of the description of the premises in the warrant due to the fact that the residence was on a rural route and that there was no box with such a number on it located in front of the place and that the house searched was not red and green brick. The description contained in both the affidavit and the warrant is: "A residence, split-level, *red and green brick*, located at Route 3, Box 435, Lewisville, Denton County, Texas." (Emphasis supplied). It further states that the premises was occupied, possessed, controlled and under the charge of Virgil John Etchieson w/m/48. The record reflects that the premises searched was a residence, split-level, *red brick with green trim*, with the address of Route 3, Box 435, Lewisville, Denton County, Texas, and that the premises were occupied by Virgil John Etchieson who was a white male.

■ Such minor discrepancies, if any, in a search warrant otherwise sufficiently describing the general location of the premises and specifically describing the premises themselves will not vitiate a search warrant for insufficient description. All that is required is that there be sufficient definiteness to enable the officer to locate the property and distinguish it from other places in the community. *Smith v. State*, 478 S.W.2d 518 (Tex.Cr.App.1972).

■ The contention that the seizure of his records from his office in his home violated his Fourth and Fifth Amendment rights is without merit. In *Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), the Supreme Court of the United States held that the search of an individual's office for business records, their seizure, and subsequent introduction into evidence, did not offend the Fifth Amendment nor did such a search warrant as in the instant case offend the accused's Fourth Amendment rights.

We have reviewed the record in its entirety and find that the remaining attacks made by appellant on the sufficiency of the affidavit and search warrant are without merit.

■ Next, he contends that venue was improper in Dallas County and that the trial court was without jurisdiction to try the offense. At the conclusion of the evidence, he moved for an instructed verdict but did not mention venue. His motion, in substance, is as follows:

"The evidence is wholly insufficient to establish jurisdiction of the offense or the persons of the defendants."

■ There is a distinct difference between jurisdiction and venue. Jurisdiction concerns the authority or power of a court to try a case. Practically all, if not all, district courts have the authority to try felony cases. Venue has to do with the place or county where a case may be tried.

The same contention was raised in *Bass v. State*, 464 S.W.2d 668 (Tex.Cr.App.1971), where we held that such an objection did not put the trial court on notice that venue had not been proven.

Lastly, he contends that the trial court improperly admitted into evidence the extraneous offense involving the procurement of Brenda Russell for prostitution purposes. V.T.C.A., Penal Code, Section 43.04, under which he was convicted provides:

"(a) A person commits an offense if he knowingly owns, invests in, finances, controls, supervises, or manages a prostitution enterprise that uses two or more prostitutes.

"(b) An offense under this section is a felony of the third degree."

■ Russell's testimony as to having been recruited for prostitution by appellant and operated from his lakehouse as well as the fact that she knew that it was appellant's house because he had told her so was admissible as evidence of appellant's continuing course of conduct in using the lakehouse as well as engaging in a prostitution enterprise as prohibited by Section 43.04, supra. It is of no consequence that Rus-

sell's part in appellant's operation occurred some two or three months following the instant offense for which appellant has been convicted. Here, as in *Shappley v. State*, 520 S.W.2d 766 (Tex.Cr.App.1975), proof of the extraneous offense by appellant was admissible to show his intent and knowledge as well as the purpose of the enterprise which he conducted from his lakehouse. While it is true that an accused is entitled to be tried on the accusation made in the State's pleading and not for some collateral crimes or being a criminal generally, it is equally consistent and recognized by this Court that this is the general rule; however, several exceptions have been established. The most important ones relating to this case are those of scienter and common plan, scheme or design. *Shappley v. State*, supra. *Albrecht v. State*, 286 S.W.2d 97 (Tex.Cr.App.1972). We hold that the testimony of Russell was admissible in the instant case as evidence of appellant's intent and motive to commit the offense of aggravated promotion of prostitution as this was a circumstantial evidence case and extraneous offenses are admissible to show motive, intent and design as part of the State's direct evidence. See *Albrecht v. State*, supra.

No reversible error having been shown, the motion for rehearing is overruled.

VOLLERS, J., not participating.

ROBERTS, Judge, dissenting.

Appellant's principal contentions are that the court should have granted his motion to suppress and his motion to require the State to disclose the identity of its informant. A proper consideration of these contentions requires that we examine the pertinent events in the order in which they occurred.

## I.

The affidavit supporting the search warrant was sworn to on December 20, 1974, by Officer Roger Duncan. It is set out in full in the majority opinion, and therefore only a small part of it will be repeated here:

"On December 18, 1974, *the informant and* an undercover officer of the Dallas Police Department called 231–9061 and requested seven (7) females for prostitution purposes be sent to *their* hotel. The female known only as 'Sin' again answered the call and stated that she would send seven (7) prostitutes to *their* location to perform straight dates, french dates, and show dates of prostitution." (Emphasis added.)

Prior to trial appellant filed his motion to suppress, and the trial court held several hearings on the motion. The first of these was on April 4, 1975. At that time Officer Duncan testified that he prepared the affidavit, typed it himself, signed it, and swore to it on his oath before the magistrate. He stated that Sergeant B. F. Fowler was the undercover officer who was referred to but not named in the affidavit.

On cross-examination Duncan was asked "which of the allegations in this affidavit are based upon Sergeant Fowler's information that he had given you?" The following exchange then took place:

"A Yes, I can. Towards the bottom of the affidavit where it states on December the 18th—about middleways through the affidavit—'On December the 18th, 1974, the informant and the undercover officer of the Dallas Police Department—,' —that's with reference to Sergeant Fowler.

"Q All right. So then the sentence following that, describing the activities on December the 18th, are connected with Sergeant Fowler?

"A That's correct.

"Q All right. Are any of the other allegations contained there on the face of the affidavit pertaining to information related to you by Sergeant Fowler?

"A No, they're not."

At no time during this hearing did Duncan suggest that the statements in the affidavit which concerned Sergeant Fowler were untrue or distorted in any way. In fact, in testifying about the affidavit and

the search warrant,[1] Duncan indicated that he remembered all of the information in both "quite clearly." In doing so, he thereby implied that he had nothing to say which would constitute a qualification or repudiation of the statements in the affidavit. The following exchange took place while Duncan was in the process of verifying the authenticity of the photocopies of the affidavit and search warrant:

"Q  Now State's Exhibits 1 and 2 are Xerox copies, is that correct?

"A  Yes, they are.

"Q  Are they, as far as you know and to the best of your knowledge, true and exact Xerox copies of the originals?

"A  Yes, they are.

"Q  How do you know that?

"A  My signature is affixed to the affidavit and *I recall the information quite clearly on both copies.*" (Emphasis added.)

On April 18, 1975, the trial court held a second hearing on appellant's motion to suppress. The primary purpose of this hearing was to determine whether the search warrant was sufficiently specific in its description of the address and location of the premises to be searched. Duncan testified, and again the record reflects no retreat from the language in the affidavit.

The next hearing was held on July 8, 1975. At the beginning of the hearing the trial judge indicated that he had granted all of appellant's motions "with the exception of the Motion to Quash and I have not ruled on the Motion to Reveal the Informant."[2] The record makes it clear that the motion to reveal the informant's identity was presented to the trial court on the day of this hearing[3] and that the State received its copy of this motion on or before the day of this hearing but after the day of the last previous hearing.

Not coincidentally, it was at this hearing that Duncan—as well as the undercover agent Fowler—first testified that the statements in the affidavit were in essence incorrect. Fowler testified that on December 18, 1974, he met Duncan and Duncan's informant. Subsequently, in the presence of Duncan and the informant, Fowler used a pay telephone attached to the wall of a building and called appellant's residence. The purpose of the call was to inform Pamela Wood (also called "Sin" and "Cyn") of the location for the proposed dates of prostitution.

Fowler testified that Duncan and the informant were standing "three or four feet" away from him when he made the call. He denied that the informant listened in on or participated in the phone call, and he stated that he did not believe that the informant heard what Fowler was saying to Wood. After completing the call, Fowler quietly told Duncan that Wood had assured him that the seven prostitutes would be at the designated hotel room by nine o'clock. On re-direct examination Fowler stated that the informant had played no role in the earlier negotiations which led to the purported date with the seven prostitutes.

Duncan followed Fowler to the stand and testified that he met Fowler during the afternoon of December 18, 1974. He stated that the informant was with him, but the informant was not at the location in order to help Fowler "in any way." Duncan acknowledged that the informant was present when Fowler called Pamela Wood and that he (Duncan) was able to overhear Fowler's

---

1. State's Exhibits 1 and 2.

2. This latter motion bears no filemark, although the unsigned order attached to it is dated July 8, 1975. The memorandum in support of this motion is filemarked with the date July 8, 1975, as are the motion to quash the indictment, the "motion with reference to arraignment of the accused," the motion to require endorsement of grand jury witnesses, the motion to direct the court reporter to record certain portions of the trial, the motion for

inspection of grand jury testimony, the motion for disclosure of electronic surveillance evidence, and the motion requesting that the jury assess punishment. From this and the judge's statement quoted in the text, it seems inescapable that the motion to disclose the identity of the informant first came to the court's and the State's attention on July 8, 1975, at the very latest.

3. See footnote 2, supra.

portion of the call to Wood. However, according to Duncan, the informant was not as close to Fowler during the call as Duncan was.

Duncan testified that after Fowler's call was completed he spoke with Duncan but not with the informant. Duncan stated that Fowler did not tell the informant anything about the phone call or anything about the date with the seven prostitutes.

When asked to explain the above-quoted language of his affidavit—which unequivocally indicated that Fowler and the informant were acting together in making the call to Wood—Duncan stated simply that Fowler made the call personally and that in speaking of "their hotel" he did not mean to refer to the informant in any way. On cross-examination, Duncan testified that what he meant to say in the affidavit was that the informant was merely "at the location along with the undercover officer when the call was made." He also stated that by using the word "their" in the phrase "their hotel," he meant to refer to the group of undercover officers who were to be at the hotel for the date with the seven prostitutes.

## II.

Appellant's initial complaint about the nondisclosure of the informant's identity is related to his contention that his motion to suppress should have been granted. Specifically, he alleges that he needed to know who the informant was in order to show that the statements in the affidavit were false.

## A.

In *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), the Supreme Court held that where the undercover informant plays a material part in the criminal occurrence which results in charges being filed against the accused, his identity must be revealed. Accord: *James v. State*, 493 S.W.2d 201 (Tex.Cr.App.1973). However, in *McCray v. Illinois*, 386 U.S. 300, 309, 87 S.Ct. 1056, 1061, 18 L.Ed.2d 62 (1967), the Court held that Roviaro applied "where the issue was fundamental one of innocence or guilt," and that even in such cases the Court "was unwilling to impose any absolute rule requiring disclosure of an informer's identity." 386 U.S., at 311, 87 S.Ct., at 1062. Instead, the Court stated, what was necessary was a case-by-case " 'balancing [of] the public interest in protecting the flow of information against the individual's right to prepare his defense.' " 386 U.S., at 310, 87 S.Ct., at 1062, quoting from *Roviaro*, supra, 353 U.S., at 62, 77 S.Ct. 623.[4]

The ultimate holding in *McCray* was that it was not necessary to reveal the informant's identity where his only function in the case against the defendant was to provide information which led to a valid search of the defendant's person. However, it should be remembered that there was no allegation or preliminary showing in *McCray* that the search was based on a false statement; in fact, the trial judge there was "convinced, by evidence submitted in open court and subject to cross-examination, that the officers did rely in good faith upon credible information supplied by a reliable informant." 386 U.S., at 305, 87 S.Ct., at 1059. Nonetheless, in its holding the *McCray* Court made it clear that disclosure of an informant's identity is much more likely to be necessary where the issue is guilt or innocence than where it is the preliminary question of probable cause. See *McCray,* supra, 386 U.S., at 309, 311–313, 87 S.Ct. 1056.

The holding in *McCray* applies to the case before us. However, I believe *McCray* must be read in the light of the Supreme Court's recent decision in *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

---

4.  However, it should be noted that the *McCray* Court also quoted with approval from the *Roviaro* holding that where " 'the disclosure of an informer's identity . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the [informer's] privilege must give way.' " *McCray*, supra, 386 U.S., at 310, 87 S.Ct., at 1062, quoting from *Roviaro*, supra, 353 U.S., at 60–61, 77 S.Ct. 623.

## B.

In *Franks*, the Supreme Court of Delaware had held that a defendant could in no instance challenge the truthfulness of the statements in a search warrant affidavit after the warrant had issued. The United States Supreme Court reversed, holding that:

" . . . where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." 438 U.S., at 155–156, 98 S.Ct., at 2676–2677.

The present case goes beyond *Franks*. Here, as in *Franks*, the appellant made a substantial preliminary showing that the affiant, acting with reckless disregard for the truth, included false statements in the affidavit. Moreover, a reading of the affidavit makes it evident that the allegedly false statement was necessary to the finding of probable cause. Compare the affidavit in *Franks*, reproduced as Appendix A of that opinion. 438 U.S., at 172–176, 98 S.Ct., at 2685–2687.

However, in this case, appellant was given at least a partial evidentiary hearing on his allegations. He was allowed to question the affiant (Duncan) and the undercover officer (Fowler) at the hearing on July 8th. But, significantly, he was not given the name of the informant despite his clearly-alleged desire to have the informant testify in behalf of appellant's contention "that the officers did not rely upon credible information supplied by a reliable informant." The opinion in *Franks* makes it clear that allegations of deliberate or reckless falsehood in an affidavit must be specific and must be accompanied by an offer of proof.

"Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained." *Id.* at 171, 98 S.Ct., at 2685.

The problem in the case before us is that, because the informant's identity was not disclosed, appellant was not able to offer proof of what the informant's testimony would have been. In a case such as this—where there is a timely preliminary showing that the affidavit contains a recklessly false statement which is necessary to the finding of probable cause—I would hold that the trial judge must not only hold a *Franks* hearing, he must also require the State to reveal the name of the informant in those cases where (1) the informant played a material part in the determination of probable cause, and (2) the defense expresses a desire to present his testimony at the preliminary hearing. To hold otherwise is to take over the fact-finding function of the trial judge by assuming that he would give no credence to any of the informant's testimony which happened to disagree with that which supported his finding of probable cause.

This appellant did make the required preliminary showing of a reckless and material falsehood; he also sought to present the testimony of the unknown informant. I would hold, under these facts, that the trial judge's failure to require disclosure of the informant's identity constitutes reversible error. I would also hold that, until the informant's identity is disclosed and the appellant is given an opportunity to present his testimony, we are without power to review on appeal the issue of probable cause.

## III.

Appellant's complaint about the nondisclosure of the informant's identity is directed not only to the issue of probable cause. Although appellant initially contends that

he needed to know the informant's name in order to show that Duncan's affidavit was not based on probable cause, he also urges that knowledge of identity was also crucial to the issue of entrapment, which is directly related to the issue of appellant's innocence or guilt. Appellant raised this contention in a timely manner in the trial court as part of his motion to require the State to disclose the identity of the informant.

I would hold that Roger Duncan's sworn statements contained in his search warrant affidavit (set out in the majority opinion) were sufficient to show that the unidentified informant "helped set up the criminal occurrence and played a prominent part in it." *James v. State*, supra, 493 S.W.2d at 202. It is not significant that the appellant did not raise an entrapment defense at trial. See *James*, supra, 493 S.W.2d at 203, 206 (dissenting opinions).[5]

For the reasons stated, I would reverse and remand.

---

**5.** Although I dissented in *James*, I am of course bound by the holding in that case.