Ray Leroy MULCHAHEY, Appellant,

v.

The STATE of Texas, Appellee.

No. 54123.

Court of Criminal Appeals of Texas, Panel No. 3.

Dec. 13, 1978.

Anthony C. Aguilar, El Paso, for appellant.

Steve W. Simmons, Dist. Atty. and Thomas C. Roepke, Asst. Dist. Atty., El Paso, for the State.

Before ROBERTS, PHILLIPS and VOLLERS, JJ.

VOLLERS, Judge.

This is an appeal taken from five convictions for theft. Punishment was enhanced under the provisions of V.T.C.A. Penal Code, Section 12.42(d)[1] and was assessed at confinement in the Texas Department of Corrections for life on each count in the indictment.

Apparently, this is a prosecution brought under the provisions of V.T.C.A. Penal Code, Chapter 3, providing for prosecution in a multiple count indictment of charges arising from the same criminal episode. The indictment alleged five separate offenses of theft in five separate counts. Each count was enhanced by the allegation of prior convictions.

The pertinent portion of each indictment alleging each primary offense recites that appellant

Did then and there unlawfully intentionally and knowingly exercise control over property other than real property, to-wit: [a vehicle] of the value of [$2,000.00 or more but less than $10,000.00][2] without the effective consent of . . ., the owner thereof, and with intent to deprive [the named owner] of said property, . .

In grounds of error 1 through 5, appellant attacks the five counts on the basis that they are fundamentally deficient in that they fail to inform appellant whether he is charged with the actual taking of each vehicle in question or is charged with receiving and concealing stolen property. Appellant cites *Warren v. State*, 514 S.W.2d 458

(Tex.Cr.App.1974) for the proposition that "theft" and "receiving and concealing" are separate and distinct offenses, each of which is constituted by different elements. This argument is erroneous in view of appellant's indictments having been returned after the effective date of the present penal code. Section 31.02, V.T.C.A. Penal Code clearly provides that "theft as defined in Section 31.03 of this code constitutes a single offense superseding the separate offenses previously known as theft . . . and receiving or concealing stolen property."

The instant indictment alleges offenses pursuant to the following section of V.T.C.A. Penal Code (effective January 1, 1974 and before amendment effective September 1, 1975):

Section 31.03 Theft

(a) A person commits an offense if, with intent to deprive the owner of property:

(1) he obtains the property unlawfully; or

(2) *he exercises control over the property, other than real property, unlawfully.*

(b) Obtaining or exercising control over property is unlawful if:

(1) the actor obtains or *exercises control over the property without the owner's effective consent*; or

(2) the property is stolen and the actor obtains it from another or exercises control over the property obtained by another knowing it was stolen. [Emphasis supplied.]

The allegations contained in each of these counts follow the suggested enumeration of elements set out in *Ex Parte Cannon*, 546 S.W.2d 266 (Tex.Cr.App.1976) (opinion on State's Motion for Rehearing), in that they allege:

the first previous conviction having become final, on conviction he shall be punished by confinement in the Texas Department of Corrections for life.

---

1. V.T.C.A. Penal Code, Section 12.42(d) provides:

 (d) If it be shown on the trial of any felony offense that the defendant has previously been finally convicted of two felony offenses, and the second previous felony conviction is for an offense that occurred subsequent to

2. The value of the vehicles alleged in the five counts are $2,000, $4,000, $4,000, $4,000 and $8,000, respectively.

(1) a person

(2) with intent to deprive the owner of property

(3) exercises control over the property, other than real property

(4) without the owner's effective consent.

The indictments are not fundamentally defective. Grounds of error 1 through 5 are overruled.

The evidence adduced at the single trial reflects that a man who could not be positively identified as appellant left an Avis Car Sales lot in El Paso on March 15, 1974, in a 1972 Ford station wagon in order to test drive the car. The automobile was not returned. The station wagon, valued at approximately $2500, was retrieved in September of 1974 from Saul Saucedo. Saucedo had bought the station wagon from appellant who stated "he was some kind of dealer from the government;" appellant had given Saucedo the title, license receipt and license plates to the station wagon which Saucedo duly registered with the Texas Highway Department. Saucedo stated he had no reason to believe the car did not belong to appellant until he was contacted by a law enforcement officer and told that the car was thought to be stolen.

On approximately June 17, 1974, a Dodge Voyager van disappeared from the used car lot of Dick Poe Chrysler-Plymouth in El Paso. The value of the van was placed at about $5,000. The special owner, Johnny Padilla, had no knowledge as to who had taken the vehicle and testified that he had given no one permission to do so. The vehicle was recovered in the fall of 1974 from Gilbert Estorga. Estorga testified that his friend, Saul Saucedo had told him about the good deal he got in buying a station wagon from appellant. Estorga thereafter initiated contact with appellant who told him he had a van for sale. On approximately July 26, 1974 Estorga paid appellant $950 in cash as a down payment and appellant gave Estorga a receipt, a written warranty for repairs and a title to the van. All of the transaction was witnessed by a notary public. Estorga testified that the license plates were already on

the van, which he assumed had been appellant's personal vehicle. Appellant told Estorga he had obtained the van through the "Embassy Corporation," which was in fact reflected on the face of the title. Estorga sent the paperwork "to Austin" and received a certificate of title to the van. Estorga stated that the transaction appeared perfectly legitimate, and it was only when Saucedo called to advise him of the stolen status of his station wagon that Estorga contacted the police and discovered that the van he had purchased was likewise stolen.

Johnny Padilla, the used car sales manager at Dick Poe Chrysler-Plymouth, testified that a 1974 Plymouth Custom Surburban wagon disappeared from his lot the same night the Voyager van was taken. Padilla, the special owner of the vehicles, evaluated the wagon at $4900 and stated he gave his permission to no one to take the wagon. The wagon was ultimately recovered from Hector Maynes. Maynes testified that on approximately August 1, 1974 he was told by his brother-in-law, David Escobar, that appellant had a 1974 Plymouth station wagon he would sell for $2400. Escobar brought the vehicle and a car title to Maynes. Maynes met appellant for the first time when appellant and Escobar came to Maynes' place of employment to make the sales transaction. Maynes had to borrow some of the money, so the transaction took place before a lending officer at the West Texas State Employees Credit Union. It was Maynes' understanding that he was buying the wagon from both Escobar and appellant; appellant was to receive $2000 and Maynes gave $500 directly to Escobar. Maynes stated that he had no reason to doubt the legitimacy of the sale. On cross-examination it was brought out that Escobar had told Maynes that appellant "could get vehicles at a very low rate because he had some purchasing power as a federal agent."

The latter part of August, 1974, a 1974 Ford Torino Grand Elite was discovered to be missing from the storage lot of Kemp Ford in El Paso. The auditors of Ford

Motor Credit Company had been conducting an inventory check at the time of the discovery; the car had been seen last on August 15. Johnny Pattison, the general manager of Kemp Ford, estimated the value of the car at $5,000 and stated that it was a "brand new unregistered car" for which he had the manufacturer's certificate of origin. The car was recovered by Pattison on October 3, 1974 from the El Paso Police Auto Theft Department. Joe Gutierrez testified that on August 7, 1974, he responded to an ad in the paper concerning a car for sale and ultimately got in contact with appellant. Gutierrez met with appellant and gave appellant $700, for which appellant gave him a receipt. Two days later, appellant met Gutierrez outside the latter's bank as Gutierrez and a bank officer were looking over the car. Inside, the bank officer gave appellant a bank draft for $2600 and appellant gave Gutierrez some "papers" among which was apparently a title reflecting appellant as the vehicle's owner.[3] It was brought out on cross-examination that appellant "mentioned he had bought [the car] and he had paid cash through the South Corps Embassy from Viet Nam."

Roy Blevins, the used car sales manager at Fortune Lincoln Mercury in El Paso testified that on September 17, 1974, a used 1974 Lincoln Continental Mark IV was "taken from the lot without permission." Blevins had no knowledge of how or by whom the car was taken. The value of the car was estimated by Blevins at $9,000. William B. McGarity testified that in October, 1974, a man who gave his name as R. A. Mulchahey came into Kumpf Motor Car Co. in Denver, Colorado with a wrecked Lincoln Continental which bore Texas license plates. McGarity stated that the car was "one just like" the Mark IV which had disappeared from Fortune Lincoln Mercury in El Paso. He could not positively identify the appellant as the man who brought the wrecked automobile in. There was no testimony as to how or by whom the car was brought back to Texas and returned to Fortune Lincoln Mercury, though Roy Blevins stated that it was returned to him in January, 1975, and he knew it had been in Denver, Colorado.

In addition to the testimony concerning the five charges against appellant, the State introduced three recent and similar transactions [4] in which appellant had sold automobiles with apparently clear titles to other individuals who later discovered the vehicles had been stolen. Rudy Sandoval, the owner of a Dodge dealership in Las Cruces, New Mexico, testified that the appellant had discussed with him his interest in buying two four wheel drive power wagon Dodge pickup trucks in August of 1974. Appellant told Sandoval he was from the "Van Horn, Pecos [Texas] area" and was in New Mexico pursuant to his welding and

---

3. Numerous documentary exhibits were introduced at trial, but none appears in the record on appeal. The testimony elicited from Gutierrez concerning the "papers" appellant gave him is unclear:

Q: [by prosecutor]: I will show you here State's Exhibit Number 40 and ask you to look at it and see if you can identify it. It's two separate items.
A: Both of these ones are license tags for the State of Texas and each says the name of the person who drives the car. The other one is the state in where it came from.
Q: All right. Now, the first two pieces of paper, where did you receive those?
A: The first two pieces I received those at the bank from him, from the Defendant.
 * * * * * *
Q: You received those at the bank?
A: And this is the one that belongs to me right here.

Q: The next two are actually tag license receipts that you received?
A: Right.

4. The State sought to introduce these transactions under the provision of V.T.C.A. Penal Code Section 31.03(c)(1) which provides:

(c) For purposes of Subsection (b)(2) of this section [see supra]:
(1) evidence that the actor has previously participated in recent transactions other than, but similar to, that which the prosecution is based is admissible for the purpose of showing knowledge or intent and the issues of knowledge or intent are raised by the actor's plea of not guilty;

The admission of the testimony introduced pursuant to the above was unobjected to and is not attacked as error on appeal.

pipefitting business. Sandoval stated that a couple of days later he discovered that both trucks—one white and the other "a yellow color"—had disappeared from his sales lot. The value of each truck was placed at $4500; Sandoval saw the trucks eight months later in El Paso. The white truck had been repainted white with blue trim.

David Escobar, a co-worker and neighbor of appellant, testified that in August of 1974 appellant told him he "could get ahold of" a Dodge four wheel drive power wagon pickup truck if Escobar were interested. Escobar paid appellant $1000; appellant gave Escobar "government purchasing forms" and told him to take them to the County offices for plates and registration and Escobar would receive a title. Appellant told Escobar that the wagon as well an another one he had which was yellow had come from Saigon, Viet Nam and was dropped off in Phoenix, that he was purchasing agent with the Federal General Services Administration, and the vehicles were government surplus. Because Escobar did not have the $100 appellant told him it would cost to process the forms, he never got the truck registered, and in early September, after an absence from his apartment, Escobar found the government form papers missing. The apartment manager told him appellant had been in his apartment to "change the locks." Three days later, Escobar discovered that his new truck had disappeared and reported this to the police.

Howard Phelps testified that in late August he was taking merchandise appellant had purchased from his pawn shop to appellant's car and noticed appellant was driving a white 1974 Dodge pickup with four wheel drive. He asked appellant if he were interested in selling it. Appellant told Phelps he was "a government disbursing agent and he bid on government vehicles from time to time and he needed some capital at this time to bid on more government merchan-

dise. He needed 25% capital to bid on some more government contracts. He called this government surplus items and these trucks were supposedly to come from Saigon, Viet Nam from the Department of Agriculture." The men negotiated a $4000 purchase price which Phelps paid in cash and appellant gave a "government disbursing form," stating, "when you buy something from the government, you don't get a title. You get a green form that entitles you to get a title at the tax office." Phelps paid the vehicle registration fee, got license plates, and appellant told him they would have to go pick the truck up in Juarez because he was having it painted. On arrival across the international bridge, Phelps put Texas plates on the truck, which was repainted white with blue trim. Phelps bought another four wheel drive Dodge truck from appellant which was "a brown" almost immediately and one day while having lunch to discuss the deal, appellant told Phelps "when the fiscal year ends, the government gets rid of all trucks in inventory and starts over for the new year." At the same luncheon, appellant showed Phelps a "registration receipt where he bought a 1974 Mark IV" the same way.

George Parker, the manager of the General Services Administration (GSA) Motor Pool in El Paso, testified that he operated a motor vehicle fleet that services the Federal Government, mainly the executive branch. He explained that when vehicles are either surplus or old [5] they are disposed of "on a spot bid sale or letter sale to the public." According to Parker, there are ten regions in the continental United States, the headquarters of which control all vehicle disposals; there is no regional headquarters in Phoenix nor does the GSA maintain a motor pool or sales office in Saigon, Viet Nam, and any GSA form 97 which reflected that a vehicle had been surplus out of Saigon would not be valid. Parker also testified that none of the vehicle identification numbers (VIN) of the automobiles involved in appellant's trial matched any of those vehicles contained in the GSA's inventory.

5. Parker stated that a sedan with less than 60,000 miles or a four wheel drive vehcile with less than 40,000 miles would not be considered old enough to sell. He added that it generally takes three to five years to put these amounts of miles on vehicles.

Albert Stephens, auto theft detail detective of the El Paso Police Department who was the main case investigator, testified that a search of the title histories of the five vehicles revealed that each one had a valid title and a title in which the vehicle identification numbers had been falsified.[6] Stephens explained that no vehicle inspection was required for obtaining title to a new vehicle, one registered under a GSA form 97, or for transferring a title. Stephens stated the only information he had connecting appellant with the false title histories was that his name was reflected on each.

A special investigator for the Texas Department of Public Safety Motor Vehicle Service, Alvin Kilpatrick, explained that a Government form 97 was issued when the GSA sold surplus property: the form was then filled out and, on submission to the Texas Highway Department as having been auctioned as a Government vehicle, the Highway Department issued a title under the VIN number reflected by the form 97. According to Kilpatrick, a GSA form 97 should be in the possession of only specified persons.

Appellant did not take the stand and the only testimony presented went to appellant's insanity defense.

By grounds of error 6 through 10, appellant asserts the evidence is insufficient to sustain the conviction in each count of the indictment because "no proof is present to show that appellant knew the property was stolen by another and he [appellant] knew it was stolen" and "there is no evidence to show appellant actually took the property." Appellant argues that the evidence shows only that he had possession of the vehicles, possessed documents for the vehicles which appeared in order and had an explanation as to where he obtained the vehicles. We disagree.

■ The evidence illustrates clearly that appellant exercised control over each of the five vehicles. His intent to deprive the owners thereof is manifested by his disposal of the vehicles in a manner that made recovery of the vehicles by their rightful owners unlikely; V.T.C.A. Penal Code Section 31.01(3)(C). The testimony regarding recent transactions similar to those alleged was admissible, therefore, on the issue of appellants knowledge of the illegality of his acts, as well as to show a common scheme, plan or design. *Etchieson v. State*, 574 S.W.2d 753 (Tex.Cr.App.1978). Because this is a circumstantial evidence case, the State was entitled to introduce this testimony in its case in chief as evidence of appellant's intent and motive to commit theft. *Etchieson,* supra. See also *Jones v. State*, 568 S.W.2d 847 (Tex.Cr.App. 1978). In addition, appellant's repeated assertion of how he had obtained the vehicles was fully rebutted by George Parker of the General Services Administration of the Federal government. It was therefore reasonable for the jury to conclude that appellant's acquisition of the stolen property had occurred in a manner inconsistent with the facts he had claimed to the prospective buyers. We hold that the State proved circumstantially that appellant exercised control over each of the vehicles knowing that he did not have the effective consent of the owner, and with intent to deprive the owner of said property. *Callahan v. State*, 502 S.W.2d 3 (Tex.Cr.App.1973); *Booth v. State*, 130 Tex.Cr.R. 9, 91 S.W.2d 713 (1936). Cf. *Smith v. State*, 518 S.W.2d 823 (Tex.Cr. App.1975).

■ Appellant's assertion that his possession of the vehicles was "explained" is untenable. As stated above, appellant's "explanations" were shown to be impossible, and therefore amount to no explanation. It is well settled that a presumption of a defendant's guilt of theft alone sufficient to sustain a conviction arises from his possession of recently stolen property, provided that such possession is personal, recent, unexplained and involves a conscious assertion of a right to the property. *Rodriguez v. State*, 549 S.W.2d 747 (Tex.Cr.App.1977);

6. According to the testimony, the VIN numbers on the vehicles themselves had remained unaltered except for one, the van ultimately bought by Gilbert Estorga.

*Barnes v. State,* 520 S.W.2d 401 (Tex.Cr. App.1975); *Farris v. State,* 127 S.W.2d 894 (Tex.Cr.App.1939). Appellant's possession of the vehicles in question is undisputed; the possessions were recent, see *Wall v. State,* 167 Tex.Cr.R. 634, 322 S.W.2d 641 (1959); appellant's explanations of his possessions were proven false by circumstantial evidence, see *Callahan, supra,* and his sale of the vehicles with falsified titles to third parties was a conscious assertion of his ownership. This, standing alone, is sufficient to support the jury's finding that appellant committed the thefts. *Rodriguez, supra.* Additional to this, several defense witnesses testified as to appellant's history of stealing things, from age six or seven, "throughout his life." From the time appellant was 15 or 16, he stole things, "mostly automobiles," to impress people or to "take his friends for joy rides;" appellant was described as a "pathological liar" who stole vehicles and told his parents or wife he was buying them or saying the other parent had bought it for him. According to defense testimony, the 32 year old appellant had been in prison five times, apparently for auto theft, and had never been affected to the extent that he had stopped such activity.

The circumstantial evidence proved that appellant habitually dealt with stolen property; the jury had ample evidence that appellant *intentionally* and *knowingly* exercised control over the vehicles in question without the consent of the owners, with the intent to deprive the owners thereof. *Hardage v. State,* 552 S.W.2d 837 (Tex.Cr. App.1977). Grounds of error 6 through 10 are without merit.

 By grounds of error 11 through 15, appellant asserts that the trial court erred in charging the jury on each of the five causes in that the court expressed an opinion as to the weight of the evidence concerning whether or not appellant was guilty or not by reason of insanity. Examination of the court's charge at the guilt-innocence stage reveals that except for the dates, property descriptions and owners, all five charges were substantially identical and read:

"If you believe from the evidence beyond a reasonable doubt that on or about [date], in El Paso County, Texas, the Defendant intentionally or knowingly exercised control over property other than real property, [a vehicle] of the value of two hundred dollars or more, but less than ten thousand dollars, without the effective consent of [owner] . . ., with intent to deprive said owner of said property, you will find the defendant guilty as alleged in [count number] of the indictment . . ., unless you find him not guilty by reason of insanity, as indicated in paragraph [number], below.

If you do not so believe beyond a reasonable doubt, you will find the defendant not guilty of count [number] in the indictment."

Appellant complains that this charge placed his burden of proof on the defensive issue of insanity at "beyond a reasonable doubt." Appellant concedes by his brief that "the court did charge immediately thereafter as to the proper law [concerning insanity]." Appellant apparently recognizes that the charge as a whole is clearly sufficient and his attack on the parts thereof is misplaced. *McElroy v. State,* 528 S.W.2d 831 (Tex.Cr. App.1975); *Mathis v. State,* 504 S.W.2d 448 (Tex.Cr.App.1974). Furthermore, the record reflects that no objection was made to the charge; therefore, nothing is presented for review. *Soto v. State,* 513 S.W.2d 931 (Tex.Cr.App.1974). See also Article 36.14, V.A.C.C.P.

The judgments of conviction are affirmed.