Leroy BATES, Appellant,

v.

The STATE of Texas, Appellee.

No. 60512.

Court of Criminal Appeals of Texas, Panel No. 2.

Dec. 15, 1982.

Rehearing Denied Jan. 26, 1983.

". . . and all final arguments made *to the jury* by counsel for the defense and the State in the above styled and numbered cause."

**940**

Ross Teter, Dallas, for appellant.

Henry Wade, Dist. Atty., and Steve Wilensky, and Brady Sparks, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., and Alfred Walker, Asst. State's Attys., Austin, for the State.

Before ONION, P.J., and TOM G. DAVIS and CLINTON, JJ.

## OPINION

CLINTON, Judge. ·

Appeal is taken from a conviction for delivery of heroin; the jury assessed punishment is twenty five years. Appellant advances fourteen grounds of error. We agree that there is reversible error in the case and, accordingly, reverse.

The indictment in the case reveals the prosecution to have been based on the single allegation that appellant "on or about the 6 day of October, [1977] . . . did unlawfully, knowingly and intentionally deliver a controlled substance, namely: HEROIN, to R.J. Mack." Yet, the evidence offered by the State, transcribed among more than 500 pages of testimony and argument, reveals the prosecution's conviction that proof of appellant's mere delivery of two pink capsules to undercover narcotics agent Mack on the date alleged would not suffice. Instead, Officer Mack was called to the stand for the initial purpose of detailing his participation "in an undercover operation beginning about the end of August and stretching on into sometime in late November of . . . 1977."

Over strenuous and repeated objection, the trial court permitted the prosecutor in the first minutes of trial to elicit testimony regarding Mack's "responsibilities and obligations . . . with the undercover narcotics bureau," ("to infiltrate drug traffic in the City of Dallas to seek known drug dealers in the city and crime perpetrated upon the citizens of Dallas County"); and the "purpose" of the undercover operation, ("to seek dealers in the community to cut off some of the main line so that some of the heroin, drugs would not be so readily available for the people that were using drugs, and to possibly cut some of the crimes that were being inflicted upon the community"). Later, Officer Mack's supervisor, J.D. James, was permitted to continue in this vein; asked the "purpose" of the undercover operation, James replied it was "to make heroin cases on heroin pushers." The prosecutor then asked "why" the witness would "go after the heroin pusher or dealer," to which James replied, "It's number one, priority drug for drug abuse to be working on for the drugs itself [sic], and also for the implications that it has in *other crimes such as burglaries*[1] and—." At this point defense counsel's objection was sustained, the jury

1. All emphasis is supplied throughout by the writer of this opinion unless otherwise indi-   cated.

was instructed but a motion for new trial was denied. Immediately, the prosecutor continued:

"Q: Would it be fair to say that going after heroin pushers has a very high priority in reducing crime?"

Appellant's objection to this question was overruled.[2]

Undercover officer Mack was also permitted to testify over objection, that he had "personal knowledge" of heroin transactions occurring at two Dallas locations, one on Bickers Street and another on El Benito.[3] He reported he first met appellant on September 15th at the latter location, then saw appellant again at the same place on September 19th. But additionally, Mack met with appellant "some six times" at the Bickers address.[4] "As a result of" his conversation with appellant on September 19th, Mack testified he thereafter was looking for appellant in his "official capacity as an undercover narcotics agent" for the "purpose" of making a heroin purchase from him. The six other times the witness met with appellant were rehashed, all over objection, and the witness this time gave each date, the time of day, the Bickers Street location and the length of time he was in appellant's presence.[5]

After having his witness again identify appellant as the person he knew to be "Tom Thumb," the prosecutor asked Mack whether he later learned the appellant's name was Leroy Bates. On Mack's affirmative answer, the prosecutor asked whether the witness "had occasion to later confirm this name and other identification by photographs." After appellant's objection was overruled, the prosecutor asked, "was this a photograph shown to you by your supervisor J.D. James?" A defense objection was again overruled. Leaving this line of testimony for the moment, the prosecutor returned to it when James was put on the stand:

"Q: Officer James, I take it that sometime prior to this time you knew the Defendant both by his street name of Tom Thumb and also by his true name of Leroy Bates.

A: Yes.

Q: Were you able to confirm that with identification records?

A: Yes I was.

Q: And were you able to further confirm that with a photograph that you obtained from identification records?

A: Yes." [6]

2. By grounds of error four through six, appellant complains of the trial court's allowing the prosecutor to adduce testimony implying he was a "known heroin pusher" and thus responsible for "other crimes such as burglary."

3. Earlier Mack has described how he changed his dress and appearance to "infiltrate certain areas of the community." Asked to tell the "type of environment" he went into, this trained officer responded: "The community where the drugs were being sold." At least twice he managed to tell the jury that the "majority of the people" at a location had, and in "some of the places" there were, weapons. Thus, by the tone of the presentation of its case did the prosecution seek to taint appellant with other than the alleged offense.

4. Outside the presence of the jury, defense counsel objected pointing out there was no reason for the State to offer evidence of the number of times the witness met appellant other than on October 6th "unless it's an attempt . . . to try to cause the jury to believe that there was more than one offense committed by the Defendant." The prosecutor argued that the evidence "goes to establish the validity of the

police [officer's identification of appellant in court,]" and "promised" the court he was not attempting to "go into" extraneous offenses. Defense counsel correctly observed that the witness' identification of appellant had not been impeached. But the court overruled his objection, again eliciting the prosecutor's pledge that he was only going to prove one sale of heroin, but would establish "the rest of the times that [Mack] met with appellant."

Defense counsel was granted a continuing objection and a "full bill."

5. The dates were October 1, October 4, October 6, October 11, October 12, October 25, 1977, all dates on which the prosecution would later prove appellant had delivered heroin to Mack and for which appellant was under indictment. October 6th was, of course, the date of the alleged offense on trial.

6. Outside the presence of the jury, defense counsel unsuccessfully argued the State's tactics constituted an intentional effort to prejudice the defendant and were implemented in bad faith:

The 55-year-old appellant took the stand in his own behalf. He testified that he had been in the "junking" business for the preceding two years.[7] According to appellant, in September of 1977, he needed money to buy some auto parts he had located in Greenville and believed he could double his money on. So he went to an acquaintance, Eugene "Chip" Townsend, for a loan. Townsend said he did not have it, but knew someone else who would lend it to appellant, and took him "to the house that they showed on one of the pictures," a "gambling house" at the El Benito Street address. Townsend introduced appellant to a man named "Black Tommy" who appellant thought was really named Tommy Walkers.[8]

"Black Tommy" agreed to loan appellant $250.00 if appellant would agree to pay him $300.00 within five days. When appellant went to Greenville for the auto parts, however, they had been sold to someone else. So appellant used the money to pay bills and buy groceries.[9] When the time came to repay the loan, appellant went to Townsend to explain he was unable to repay it; Townsend again took him to "Tommy." "Tommy" became angry and told appellant he killed people who failed to pay him his money. Finally, "Tommy" told appellant he had some "dope" the latter could "get rid of" for him, and said he was going to put appellant "in with Chip." Appellant was given $150.00 and told to go rent the house on Bickers, which he did.

According to appellant, he was instructed to meet daily with "Chip" Townsend; when he did, Townsend would give him some capsules and tell him to "stay in this house," that he (Townsend) would send people by.[10] In the evening, appellant turned any money and remaining capsules over to Townsend. Appellant conceded he knew the pills contained "dope," but vehemently denied he knew it was heroin.[11] He testified that on October 6, 1977, no one came by other than R.J. Mack, and at that time he gave Mack two capsules for $24.00.

On cross examination, the prosecutor elicited from appellant the fact that he had stayed at the house for approximately three weeks or a little longer, but did not know how many people he had sold "these pills to." Then, apparently in response to appellant's testimony that he did not know the "dope" was heroin, the prosecutor began asking him about *when* he had become aware he was charged with "the sale of heroin." Appellant testified that he knew what he was in jail for after his arrest, but that he did not look at the indictment served on him right away. Appellant again told the prosecutor he *did* know what he was charged with, then, illustrative of the tenor of the entire trial, the following transpired:

"Q: Oh, you did know?—You just got through saying that you didn't know. When did you—
[DEFENSE]: Your Honor, we object. He is arguing with the witness.
[STATE]: I object, Your Honor—

---

"This testimony clearly implies that the police department already had an identification picture which could only refer to a mug shot, concerning prior arrests or prior convictions. * * * That tied in with the previous testimony of the witnesses that the purpose of their operation was to make heroin purchases from known—exactly his words—known users or dealers...."
This complaint forms the basis of grounds of error seven and eight on appeal.

7. Before that, according to appellant, he had worked for five years at a Tom Thumb Grocery Store, and thus, his nickname.

8. The State, however, later established that Tommy Walkers had been a bedridden invalid for several years before his recent death. It was an ex parte discussion between the prosecutor and the trial judge regarding the admissibility of Walker's illness and death which forms the basis of appellant's twelfth ground of error.

9. Appellant had testified that he and his wife had five dependent children.

10. Officer Mack was recalled during the Defense's case in chief. At this time, he acknowledged that Eugene Townsend had introduced him to appellant and told him anytime he needed dope and he (Townsend) was not around, Mack should go to the house on Bickers and "Tom Thumb" would "take care of" him.

11. Undercover Officer Mack confirmed the word "heroin" was never used in the transactions.

(All counsel talking simultaneously)

THE COURT: Let's go ahead and answer the question.

THE WITNESS: May I say something?

THE COURT: You may not say anything. Just answer the questions.

Q [By STATE]: As a matter of fact *you received five copies of the indictments, didn't you?*

[DEFENSE]: To which we object.

Q [By STATE]: *All of those copies of indictments were for the sale of heroin —*

[DEFENSE]: (interposing) We object—

Q [By STATE]: (interposing) As a matter of fact, *you are charged at the present time with the sale of heroin in five separate cases, are you not?*

[DEFENSE]: To which we object, Your Honor.

THE COURT: Overruled.

Q [By STATE]: Now, just to get it straight, didn't you think that was serious?

A: Sure I thought it was serious."

In his second and third grounds of error, appellant complains of the trial court's permitting the State to adduce evidence that he had committed four other first degree felony offenses and was presently under indictment for those offenses. Appellant argues, citing numerous authorities, that this evidence was not probative of any issue raised by his defense. The State retorts that the extraneous offenses—all of which were sales of heroin committed within a month of the primary offense—were rendered admissible on the issue of "knowledge" after appellant testified on direct examination that he knew he was selling capsules of "dope" but had no knowledge that

they contained heroin, citing *Butler v. State,* 509 S.W.2d 873 (Tex.Cr.App.1974). As for the trial judge's position on the matter, in his charge, the jury was instructed that testimony regarding the defendant's commission of "offenses other than the offense alleged against him in the indictment in this case," could be considered for no purpose other than in "determining the motive, intent, or identity of the defendant, if any, in connection with the offense, if any, alleged against him in the indictment in this case, . . . ." [12]

It is an established generic principle of evidence that proof of prior specific acts of misconduct, similar happenings or extraneous transactions committed by a party is not probative of the contested material issues in the case on trial, and therefore inadmissible. See generally *Sanders v. State,* 604 S.W.2d 108 (Tex.Cr.App.1980); *Murphy v. State,* 587 S.W.2d 718 (Tex.Cr. App.1979) and cases cited there. In a criminal proceeding, when the State seeks admission of an extraneous or similar transaction committed by the accused which constitutes a separate criminal offense, introduction of that "extraneous offense" transaction is inherently prejudicial, since the accused has no notice he will be called to defend against it, and his "propensity to commit crimes" is not material to whether he is guilty of the specified conduct which is charged by the State. *Rubio v. State,* 607 S.W.2d 498 (Tex. Cr.App.1980); *Sanders,* supra; *Murphy,* supra, and cases cited there.

But, as was observed in *Rubio,* supra, at 506 (Concurring Opinion):

"[T]hese evidentiary principles, as most, must in some circumstances give way. For extraneous transactions constituting offenses shown to have been committed by the accused [13] may become admissible upon a showing by the prosecu-

**12.** To this charge, defense counsel lodged the following objection, which was overruled:

"It is the contention of the Defense that the only basis for extraneous offenses to be admitted, if they were admissible at all, and they were admitted over our objections, would only be the question of the identity of the Defendant and not to motive or intent. There is no motive involved in the delivery of

heroin and *the intent is not proved by the extraneous offense[s] in this case."*

**13.** It is always required that the commission of the extraneous offense is clearly proved and the accused is shown to have been its perpetrator. *Sanders,* supra; *Carrillo v. State,* 591 S.W.2d 876 (Tex.Cr.App.1979); *Ransom v. State,* 503 S.W.2d 810 (Tex.Cr.App.1974); see also 23 T.J.2d *Evidence* § 195 (1961).

tion both that the transaction is *relevant* to a *material* issue in the case; and, the relevancy value of the evidence outweighs its inflammatory or prejudicial potential.

In determining this evidentiary balance in a case established by direct evidence [14] the court must consider whether the material issue to which the extraneous conduct is relevant is *contested,* and, if so, in looking to the attributes of the extraneous offense as shown by the State, determine whether its admission would be of *assistance to the jury* in resolving the contested issue before it." [emphasis original] [citations and footnotes omitted]

Applying this analysis to the facts of the instant case, we first observe that the issue of appellant's "identity" was never contested by him.[15] Thus, though material, the extraneous offenses were not admissible upon that uncontested issue. Appellant's defensive testimony, however, did raise contested issues regarding his "motive" in selling heroin to Mack—he claimed to be doing it, not for profit, but to avoid death at the hands of "Black Tommy"—and his "knowledge" that the substance sold was heroin.

The question before us, then, is whether the fact that appellant was "charged at the present time with the sale of heroin in five separate cases," tends to prove that he was *not* motivated by a death threat and *knew* the capsules contained heroin at the time of his commission of the primary offense, and thereby rebuts appellant's defensive theory. We are not persuaded that it does.

*Butler,* supra, cited by the State, illustrates well the case in which extraneous offenses tend to demonstrate the scienter of the accused that is in issue.

In *Butler,* supra, the State's evidence established that Butler and his co-defendant, Johnny B. Hayes, met undercover officers Foster and Simmons in a parking lot; Butler asked Foster whether he wanted to buy some heroin. Officer Simmons instead agreed to buy a gram for $50.00 and gave Butler three $20.00 bills. A few moments later, Simmons went to Butler's vehicle where he observed Butler hand $10.00 wrapped around a yellow balloon to Hayes, who in turn, handed it to Simmons. After the State rested, the defense called the co-defendant, Johnny Hayes, who testified Butler "was not present at the time of the transaction and had no knowledge of the sale." He claimed Butler had arrived after the bargain was struck, and when the heroin was handed to Simmons, Butler was unaware that a heroin transaction was occurring in his presence. The witness also testified, apparently gratuitously, that this instance was the only time he had ever been involved in a sale of heroin.

Thus on cross examination, the State elicited without objection Hayes' admission that he had entered a plea of guilty to a charge of heroin sale, alleged to have been committed approximately five weeks before the transaction on trial. Again, without objection, Hayes was asked whether he had told Officer Foster at the time of the extraneous offense, that he was out of heroin, having just sold ten grams, and then had taken Foster to appellant Butler's house where the undercover officer bought a gram of heroin from Butler. Hayes vehemently denied Butler's involvement in the extraneous transaction. So Officer Foster was called by the State in rebuttal; he testified that on contacting Hayes the day of the prior heroin sale, Hayes advised him he had just sold ten grams of heroin and if Foster wanted some they would have to go to "his partner's house." Hayes took Foster to appellant Butler's house where Foster observed Hayes give Butler $500.00 "for his share of the sale of drugs." Foster then related, over an "extraneous offense" objection, that he also purchased two grams of heroin from Butler.

---

14. When the case is one of circumstantial evidence, a different process applies in determining admissibility. See *Mulchahey v. State,* 574 S.W.2d 112 (Tex.Cr.App.1978); *Etchiesen v. State,* 574 S.W.2d 753 (Tex.Cr.App.1978); *Jones v. State,* 568 S.W.2d 847 (Tex.Cr.App. 1978).

15. While appellant did testify that Officer Mack looked very different in court, he never denied selling him two capsules on October 6, 1977 at the Bickers Street house.

Obviously, the evidence of Hayes' conviction for the extraneous offense became admissible on the material issue of the witness' credibility, an issue raised by his denials of involvement in any other sale of heroin. Further, it was proper for the State to then elicit from Hayes a denial that Butler was involved in the extraneous offense, just as he had denied Butler's participation in the offense on trial. At that juncture, undercover officer Foster's testimony regarding Butler's involvement in the extraneous transaction was admissible, again, primarily on the issue of the witness' credibility.

■ Though evidence of an extraneous offense implicating the *accused,* which is admitted to impeach the credibility of a defense *witness,* is not always more probative than prejudicial, this "evidentiary balance" can only be made on a case by case basis. And in *Butler,* supra, it is immediately apparent that the extraneous heroin sale was probative, not only of the witness Hayes' credibility, but also of the likelihood that the accused could have been present at the actual delivery of heroin to Simmons constituting the primary offense, and *not be aware* that a heroin *transaction* was occurring, as asserted by his defensive evidence.

In sum, the extraneous offense revealed Butler to be Hayes' "partner" in the sale of heroin. In view of this, Butler's defense that he "didn't know a heroin transaction when he saw one," was demonstratively less persuasive if not obliterated. Thus, the court correctly concluded the extraneous transaction constituting a collateral sale of heroin was "admissible to show [Butler's] intent and his guilty knowledge, and [because it] tended to defeat and discredit the defensive theory of lack of guilty knowledge." 509 S.W.2d 875.

■ By contrast, in the instant case, appellant's defense raised a very narrow issue:

he claimed that he rented a house, delivered capsules which he did not know contained heroin to persons he had been told were sent by Eugene Townsend, made change and turned any money and the remaining "dope" over to Townsend at the end of the day for several weeks in order to work off a debt owed "Black Tommy." Unlike Butler, appellant never disclaimed all knowledge of the drug transaction alleged against him; neither did he by inference or otherwise contest the issue that his *conduct*[16] constituted that required for a prohibited drug delivery, nor imply that he never delivered drugs.

While appellant *did* deny that he "knew anything about heroin" and that he had ever "messed" with drugs other than the days at the Bickers Street house, the State did not introduce extraneous offenses which logically rebutted those matters; instead, proof of the collateral crimes interjected by the prosecutor was equally as consistent with appellant's defense as were the facts established by the State on the main charge: without the legally "required culpability," appellant delivered capsules containing heroin to R.J. Mack five times instead of once, after Eugene Townsend had told Mack "Tom Thumb" would take care of him. In short, in looking to the attributes of the extraneous offenses, and the fact that appellant stood under indictment therefor, we are unpersuaded that their admission could have been of any assistance to the jury in resolving the material issues regarding appellant's motive, intent or guilty knowledge, which were contested by defensive testimony. See and compare *Sanders,* supra.

We hold therefore, that because the collateral matters foisted into the trial by the prosecutor were irrelevant to the material issue joined by appellant's defensive testimony, the trial court's admitting them constituted error.[17]

---

16. Elements of offenses proscribed by the Controlled Substances Act are, by virtue of V.T.C.A. Penal Code, § 1.03(b), the same as in offenses defined by our penal code; at a minimum they always include:

"(A) the forbidden conduct;

(B) the required culpability;
* * * "

And neither one nor the other can ever, alone, constitute an offense.

17. We also reject the State's additional contention on appeal that appellant's direct testimony

Moreover, upon a review of the record before us as a whole, including the evidence adduced, the issues raised and the punishment assessed, there can be no question but that the error committed was prejudicial to this 55 year old appellant who had no prior felony record.

Accordingly, the judgment of conviction is reversed and this cause is remanded to the trial court.[18]

TOM G. DAVIS, Judge, dissenting.

Appeal is taken from a conviction for delivery of heroin. After finding appellant guilty the jury assessed punishment at 25 years. The majority reverses the judgment of conviction and remands this case to the trial court for new trial. In doing so, the majority found that the trial court impermissibly allowed the State to adduce evidence that the appellant had committed four other first degree felony offenses and was presently under indictment for those offenses. The majority found the following questions posed by the State to appellant on cross-examination to constitute error:

"Q. Oh, you did know?—You just got through saying that you didn't know. When did you—

"[Defense]: Your Honor, we object. He is arguing with the witness.

"[State]: I object, your Honor—

"[All counsel talking simultaneously]

"THE COURT: Let's go ahead and answer the question.

"THE WITNESS: May I say something?

"THE COURT: You may not say anything. Just answer the questions.

"Q. [By State] As a matter of fact you received five copies of the indictment, didn't you?

"[Defense]: To which we object.

"Q. [By State] All of those copies of indictments were for the sale of heroin—

"[Defense]: [Interposing] We object—

"Q. [By State] (Interposing) As a matter of fact, you are charged at the present time with the sale of heroin in five separate cases, are you not?

"[Defense]: To which we object, Your Honor.

"THE COURT: Overruled.

"Q. [By State] Now, just to get it straight, didn't you think that was serious?

"A. Sure I thought it was serious."

It is clear from the record that appellant's only objection to this testimony was a general objection which does not preserve error for review. *Williams v. State*, 549

"implied that he sold 'pills' to Officer Mack on more than one occasion," and thus, rendered the extraneous offenses and appellant's indictments therefor admissible. For it was the State that was permitted, over objection, to set global limits on the "context" of the offense on trial, adducing during the case in chief highly prejudicial and wholly irrelevant evidence regarding the "purpose" of Mack's undercover operation, the "reason" for pursuing "dope pushers," the "reason" Mack went to the Bickers Street house, the "number of times" Mack met with appellant there, the fact that Mack identified appellant through police records and confirmed that identification with other police officers. Compare *Gaston v. State*, 574 S.W.2d 120 (Tex.Cr.App.1978).

Thus, if appellant's testimony that he "stayed" at the house on Bickers at the behest of "Chip" Townsend and never left that location with money or "pills," implied, as the State contends, that he sold to Officer Mack on more than one occasion, it was only because of the meticulous manner in which the State went about erecting the backdrop and setting the

stage during the case in chief. Indeed, the testimony Officer Mack gave regarding the heroin transaction for which appellant was on trial consumes no more than three pages of transcription!

Plausibility of the claim is further strained by the disclaimer advanced repeatedly by the State's brief that *appellant* was not referenced or implicated in the collateral matters adduced during the State's case in chief. It is only appropriate to posit the rhetorical: What, then, was the State's purpose in interjecting them into *appellant's* trial?

In short, the State's argument comes full circle and reveals itself to be untenable.

**18.** We would also sustain appellant's ground of error thirteen in which an argument by the prosecutor at the punishment stage encouraged the jury to differentiate between the *sentence* they would assess and the length of time appellant would actually spend in the penitentiary, but we will presume that upon a retrial this error, along with others, will be avoided.

S.W.2d 183 (Tex.Cr.App.1977); *Smith v. State,* 513 S.W.2d 823 (Tex.Cr.App.1974). A general objection to the admission of extraneous offenses is insufficient to preserve such error for review. See, e.g., *McWherter v. State,* 607 S.W.2d 531 (Tex.Cr.App.1980); *Carr v. State,* 600 S.W.2d 816 (Tex.Cr.App. 1980); *Williams v. State,* supra; *Smith v. State,* supra. The judgment should be affirmed.

I dissent.