LaStarza MANNIE, Appellant,

v.

The STATE of Texas, Appellee.

No. 05–86–00640–CR.

Court of Appeals of Texas, Dallas.

Oct. 7, 1987.

Fred M. Talkington, Dallas, for appellant.

Pamela Sullivan Berdanier, Dallas, for appellee.

Before STEPHENS, HECHT and THOMAS, JJ.

HECHT, Justice.

A jury convicted LaStarza Mannie of sexually assaulting his 12–year–old niece, and sentenced him to 35 years' imprisonment. On appeal, Mannie complains that evidence of his having sexually assaulted his niece on a prior occasion should not have been admitted, that the evidence is insufficient to support his conviction, and that the statutory parole law instruction should not have been given to the jury. We overrule Mannie's three points of error and affirm the conviction.

To see whether evidence is sufficient for conviction, we must view it in the light most favorable to the verdict and decide whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *Sutherlin v. State,* 682 S.W.2d 546, 548–549 (Tex.Crim. App.1984). We therefore turn our focus upon the evidence in support of the verdict.

At the time of trial in 1986, Mannie was 35 years old, divorced with no children. Before the events of Christmas-time 1985 which concern us here, Mannie had, on occasion, lived in the home of his brother, who was married with five children. Even

when he was not living in his brother's home, Mannie often stayed with the children when their parents were away. M——, Mannie's niece, the oldest of the children, was a twelve-year-old seventh-grader during the period of time important to this case.

M—— testified that one evening between Christmas 1985 and New Year's Day, her father and Uncle Mannie returned home from fishing about 10:00 p.m. M—— remembered that she had gone to bed about an hour earlier but awakened when she heard her father's car start up and pull out of the driveway. She would later learn that her father and mother left to go to the store, but that night she just fell asleep again after hearing the car leave.

A few minutes later, M—— was again awakened, this time by her uncle Mannie pulling her out of bed. She recalled that he took her, half asleep, into the den and laid her on the floor between the couch and fireplace, face up, dressed only in her panties and mother's cotton nightgown. By the dining room light she could see her uncle Mannie, wearing pants, a jacket and a sweater, crouch over her and pull down his pants. Then, M—— testified, while her brothers and sisters slept, Mannie raped her. Mannie stayed on top of her for what seemed like a long time, M—— said, moving up and down, hurting her, saying nothing. Suddenly, as M——'s parents' car drove up, Mannie stopped, got off her, pulled his pants up, and in a rough voice told her to tell no one what had happened. M—— got up and returned to bed.

M—— testified that she waited in bed until her mother was asleep and her father had left to take Mannie home, and then went to the bathroom and washed herself with a wet wash cloth and soap. She testified that she did not see anything wet on her but she cleaned up because there might have been, as there had been before, the first time Mannie assaulted her.

Over Mannie's objection, M—— testified that Mannie had raped her once before, about two months earlier, when Mannie was staying with her and her brothers and sisters while her parents were out of town.

That time, she said, she was in her room doing her homework when Mannie came in and told her to go clean up the bathroom. She testified that when she went to the bathroom to do as she had been told, Mannie came in the bathroom with her, shut the door, and pulled down his pants. Then, she stated, Mannie laid her face up on the floor, pulled down her pants and underwear, and raped her, moving up and down. M—— testified that Mannie hurt her, and that when he got up she noticed "wet stuff" on her leg. Mannie pulled his pants up and left. M—— cleaned up with a wet cloth and soap, and then returned to her room.

M—— testified that at first she told no one about the earlier incident because she was afraid. She said she was bothered at school and at home and thought about what had happened, but kept it inside. After the later incident she was also afraid to tell anyone what had happened, partly because Mannie had warned her in a rough voice not to, and partly because people would think bad of her. M—— testified that she felt embarrassed and unclean.

M—— said her conscience continued to bother her until she decided she had to tell someone what had happened. On February 5, 1986, during her lunch break at school, she went to her guidance counselor's office, closed the door, and said she needed to talk. The counselor testified that M—— was crying and had difficulty talking, but managed to tell about both times Mannie had raped her. The counselor called her mother to take her home, and her mother called the police.

The next day M—— and her mother saw Dr. Julie Fryberg at Children's Medical Center. Dr. Fryberg examined M—— and testified at trial that she had a torn hymen, consistent with penetration of her vagina by a male sexual organ. Dr. Fryberg testified that during the examination M—— was cooperative but withdrawn, "very appropriate for having experienced [a sexual] assault."

M—— testified that Mannie had stayed with her and her brothers and sisters many times and had never been ugly to any of

them. She said Mannie had been good to her and that she was not afraid of him. M___ testified that she goes to church and knows the difference between the truth and a lie. She stated that she watched television and read newspapers, but that she had never read about child abuse. She testified that she did not make up the charge against Mannie.

M___'s father testified that these circumstances had been a "very heartrending and emotional time". He remembered that Mannie had stayed with his children while he and his wife had traveled to Tennessee. He also stated that he and Mannie had probably gone fishing in December, although he simply could not recall one way or the other having done so between Christmas and New Year's Day. M___'s father acknowledged that he testified before the grand jury that he believed his daughter over his brother, but that his daughter did not appear to have been emotionally hurt.

One of Mannie's best friends, Bob Steele, testified that Mannie stayed with him and his wife at their trailer home all weekend after Christmas. Most of the time, Steele said, he and Mannie just laid around and watched cartoons on television. He was pretty sure, he said, that Mannie did not go fishing with his brother that weekend. But Steele's testimony, it is fair to say, was rather ambiguous at best, as the following excerpts show:

Q Do you recall what you did on Saturday [after Christmas]?

A Mainly laid around.

Q All right. Did you go with LaStarza Mannie over to his brother's house?

 . . . . .

A I don't think so, no.

Q Did you go at any time around the Christmas holidays?

A No.

Q And during the Christmas holidays, during that vacation time, Les Mannie was with you at least that whole weekend?

 . . . . .

A Yes.

Q And the—Les was there that Saturday?

A Yes, uh-huh.

Q And he never left the house?

A That night, yes.

Q I'm talking about Saturday.

A No.

Q He never left the house?

A No.

 . . . . .

Q You just stayed there and watched TV the whole time?

A Yeah....

 . . . . .

Q So you watched cartoons all day long?

A Yes.

 . . . . .

Q So, you watched every move that he made?

A Every move?

Q Yeah.

A Well, he didn't leave the house.

Q You're positive about that?

A Yeah.

Q Didn't leave the house over what period of time? I'm talking about from, let's say, the Friday that you're talking about until—Well, what day was Christmas on?

A Tuesday, I believe. [Christmas was actually on Wednesday in 1985.]

Q Okay. So, from what period to what period of time are you saying that Les never left the house?

A You mean leave the house to go out, stay two, three hours? Is that what you're saying?

Q I'm just talking about leave the house.

A No, he didn't leave the house, no.

Q Over what period of time, two weeks, three weeks? Beginning when and ending when?

A Okay. I say that next month in January he probably left the house that second week in January. He might have went fishing with his brother, something like that.

Q Okay. So, we're talking from what time to the second week in January did Les Mannie never leave the house?

A What specific time? Is that what you're saying?

Q I'm just trying to get a ball park. From what time to what time? From what time to—what period of time from here, point A, to point B, second week in January, did—are you saying that Les Mannie never left your house?

A That's a difficult question. I can tell you this: That Saturday morning he was there; Sunday morning he was there; Monday morning I believe I took him to work.

The only night between Christmas and New Year's Day that Steele said he was with Mannie was the Friday night after Christmas. M___ did not recall what day of the week it was that Mannie assaulted her. Steele's memory was vague, despite the fact that Mannie had called Steele from jail to ask him to remember what went on the latter part of that December. "Really," he told the jury in the courtroom, "I didn't remember until I was sitting outside out there."

Finally, Mannie himself testified. He admitted that he had stayed with M___ and her brothers and sisters when their parents were in Tennessee, and that he often went fishing with his brother, M___'s father. But Mannie denied that he had gone fishing with M___'s father anytime between Christmas 1985 and New Year's Day, and that he had ever sexually assaulted M___. His only explanation of his whereabouts from Christmas to New Year's Day was: "I was over to Bob Steele's house, where I was living." Mannie acknowledged that at the time he testified he was on parole from a sentence of eight years' imprisonment in the penitentiary for two felony convictions of possession and delivery of heroin.

Taking Mannie's complaints on appeal in logical order, the reverse order in which he presents them, we first address Mannie's argument that the trial court erred in admitting evidence of an extraneous offense, namely, M___'s testimony about the first time Mannie raped her about two months before the offense with which he was charged.

■ Generally, evidence of an extraneous offense is inadmissible unless it is relevant to a material issue, and its probative value outweighs the danger of unfair prejudice. *Williams v. State*, 662 S.W.2d 344, 346 (Tex.Crim.App.1984). In a case of sexual assault by an adult against a minor, however, evidence of prior sexual offenses by the adult against the minor may be admissible to "aid the jury in properly evaluating the 'inherently questionable testimony of a minor against an adult responsible for his welfare' or in a position of authority or control over the minor." *Boutwell v. State*, 719 S.W.2d 164, 178–179 (Tex.Crim. App.1985).

Cases involving sexual assault of children are not an exception to the general rule of the inadmissibility of extraneous offenses, as they are sometimes mischaracterized, but only a special application of the rule. The decision to admit or exclude evidence of extraneous offenses in any case, regardless of the charge, can be made only after logical analysis and never automatically or mechanistically. *Id.* at 172.

> *Every* case must be examined on its own facts, strengths, and weaknesses to determine whether the extraneous transaction is relevant to a material issue, and whether the relevancy value outweighs the prejudicial potential.

*Id.* at 174.

Broadly speaking, the potential prejudice to the defendant is that he will be tried for a crime with which he is not charged, or as a person predisposed toward criminal conduct generally without regard to the particular offense for which he is indicted. *Id.* Against such possible prejudice the probative value of the evidence must be weighed.

■ In this case, evidence of Mannie's prior sexual assault on M___ was relevant to place the charged offense in the context of the relationship between Mannie and his niece. *Boutwell* expressly acknowledged the propriety of admitting evidence

> of acts which occurred between the minor complainant and the defendant so as

to explain the charged act and view such an unnatural act in light of the relationship of the parties as well as to make a child's accusation more plausible. A jury would otherwise hear essentially an incomplete version of the charged offense, as though it had occurred in a vacuum as a one-time act. Such evidence from a child, standing alone, might be considered implausible or incredible.

*Id.* at 175.

The jury's decision in this case, as in many cases involving sexual assault of a child, came down to one issue: whether to believe the complainant or the defendant. It is, of course, not unusual for a case to turn on the credibility of witnesses. What is unusual about cases involving sexual assault of a child is that the very nature of the allegation tends to make the complainant's testimony implausible. M——'s credibility, like that of complainants in many such cases, was in doubt before she opened her mouth simply because of the nature of her testimony: she was accusing her father's brother of the unnatural and despicable act of having sexual intercourse with his twelve-year-old niece. Such "inherently questionable testimony", as the court of criminal appeals characterized it in *Boutwell,* placed M—— at a disadvantage in testifying against her uncle. To overcome this inherent disadvantage, it was important to show that the charged offense did not occur "in a vacuum as a one-time act." *Id.; see Smith v. State,* 719 S.W.2d 402 (Tex.App.—Houston [1st Dist.] 1986).

This is especially crucial when, as here, the defendant had it within his power to deny corroboration to his victim's charge. Mannie could choose to rape his niece, not in public or in front of witnesses, but in secret. He could pick an occasion—in M——'s own home with her parents gone for only a short while—when it was even more unlikely that he would attempt such a thing. He could use his relationship of

authority over M—— to intimidate her into a silence that allowed all tangible evidence to dissolve and with every passing day cast a darker shadow of doubt over her eventual accusation. The only "corroboration" left M—— was to explain the whole of her relationship with Mannie, both good and bad, which she did. *See Boutwell,* 719 S.W.2d at 178.

The possibility that the jury convicted Mannie for the prior extraneous offense rather than the subsequent charged offense is remote. The only significant difference in the two incidents was that Mannie admitted being present in M——'s home at the time of the first incident but denied being present at the time of the second incident. Thus, the issue of opportunity raised in the charged offense was not present in the extraneous offense. Nevertheless, the factuality of both incidents rested squarely upon M——'s credibility, and her testimony regarding the extraneous offense was not significantly more believable than her testimony regarding the charged offense, if it was more believable at all.

The possibility that the jury convicted Mannie as an inveterate scoundrel based on M——'s testimony of the extraneous offense is likewise remote. Had there been evidence of chronic sexual abuse, as is not uncommon in such cases, or of other offenses completely unrelated, perhaps a jury might have been persuaded to convict Mannie as a confirmed criminal while harboring reasonable doubts that he actually committed the charged offense. The possibility that the jury would be inflamed over evidence of one recent extraneous offense of like kind, at least in the circumstances of this case, is not great.

 In this case, M——'s testimony about the other time Mannie raped her is peculiarly relevant to the jury's main concern, her credibility.[1] Mannie's attorney

---

1. The trial court may have considered the extraneous offense evidence relevant on the issue of Mannie's identity. Although the trial court did not state his reasons for admitting the evidence, he instructed the jury that they could consider evidence of Mannie's prior sexual assault of M—— only in determining the issue of his identity and for no other purpose. We do not agree that the extraneous offense evidence was admissible on the issue of Mannie's identity because there was no question at trial that M—— properly identified her uncle and thus no issue of

put the crucial question to M__ directly: hadn't she made the whole thing up? In this day and time, sexual encounters and stories of sexual abuse are tragically commonplace enough in a twelve-year-old's world to stimulate an active imagination and provide the details for a credible tale. Such knowledge, however, does not supply a seventh grader with the skill to fabricate a lie that can withstand the assay of cross-examination and convince twelve adults beyond a reasonable doubt. As difficult as it is to improvise one plausible story, it is doubly difficult to devise two. If M__'s testimony about the extraneous offense had been dubious, her otherwise credible testimony about the charged offense would likewise have been subject to question. However, M__'s realistic descriptions of both incidents helped establish her credibility. If M__ were imagining things against her uncle Mannie, then why more than one incident, why not more than two, and why stories with different details? Could M__ tell two complete stories of sexual abuse by her father's brother in the unfamiliar crucible of the courtroom that could persuade twelve jurors beyond a reasonable doubt and, importantly, her own skeptical father? The extraneous offense evidence was relevant to answer such questions and to enable the jury to judge credibility.

■ Following *Boutwell*, we reaffirm that evidence of an extraneous offense is not admissible in every case involving the sexual assault of a child. We have carefully examined this case, as we are required to do, and conclude that here the probative value of the extraneous evidence outweighed any possibility of prejudice. The trial court did not err in admitting the evidence.[2]

■ Turning to the issue of whether the evidence is sufficient for conviction, we emphasize that we cannot judge the credibility of witnesses or the weight to be given their testimony, nor may we resolve conflicts in the evidence. Those matters are for the jury alone. *Esquivel v. State,* 506 S.W.2d 613, 615 (Tex.Crim.App.1974). Only the jury could contrast M__'s demeanor with Mannie's. Only the jury could judge whether the details of M__'s account of what happened and the manner in which she related them were too real and too coherent to have been fabricated by a twelve-year-old, nervous about testifying for the first time in court, who, freely admitting that her uncle Mannie had been good to her, had no apparent motive to lie. Only the jury could decide whether the testimony of Mannie, a twice convicted felon on parole, and his best friend, Steele, attempting to provide Mannie with an alibi, was too vague and inconclusive to be believed. Only the jury could decide to believe the victim over her assailant. It is

---

identity raised. However, it is not error to admit evidence for a wrong reason as long as a right reason exists, as it does here. *Sewell v. State,* 629 S.W.2d 42, 45 (Tex.Crim.App.1982). As for the jury instruction, even if it should not have been given, it benefited Mannie.

2. Although Mannie has not raised the point, a prerequisite to admission of evidence of an extraneous offense to explain the relationship between the defendant and a child-victim in a sexual abuse case is that the defendant first deny the charged act or his relationship with the victim, or undermine the State's case by cross-examination or other evidence. *Boutwell,* 719 S.W.2d at 175, 178. A plea of not guilty does not establish this prerequisite. Here, the State adduced evidence of the extraneous offense through the testimony of M__, its first witness, on direct examination and prior to cross-examination or any other evidence offered by Mannie. The prerequisite of some denial by the defendant is " 'an aspect of the "more probative than prejudicial" analysis' ", *Boutwell,* 719

S.W.2d at 175, and not purely an issue of timing, although timing is a factor. Ordinarily, relevance cannot be balanced against prejudice until the defendant reveals his challenge to the State's case. Furthermore, to admit evidence of an extraneous offense at the outset of trial may force the defendant to make a more desperate attack than he would otherwise have chosen to make.

In this case, however, it was very plain, even before cross-examination, that M__'s credibility was in issue. Neither the trial record nor the briefs on appeal contain any hint that Mannie was forced to modify his case because of the admission of M__'s testimony about the prior sexual assault on direct examination. Although the trial court should have excluded the extraneous offense evidence until the State's rebuttal or at least redirect examination, the failure to do so in this case was harmless.

not for us to decide whether Mannie was guilty; that decision is the jury's exclusive prerogative, to be made without reasonable doubt. Our duty is but to pronounce whether they could have made their decision rationally. We conclude that they well could have. The evidence is sufficient to support Mannie's conviction.

Finally, we hold, based upon our prior decisions, that the trial court did not err in giving the jury the parole law instructions required by article 37.07, section 4, of the Texas Code of Criminal Procedure. *Rose v. State,* 724 S.W.2d 832 (Tex. App.—Dallas 1986, pet. granted); *Joslin v. State,* 722 S.W.2d 725 (Tex.App.—Dallas 1986, pet. granted).

The judgment of the trial court is accordingly affirmed.

THOMAS, J., concurs.

THOMAS, Justice, concurring.

Because of the Texas Court of Criminal Appeals' holding in *Boutwell v. State,* 719 S.W.2d 164 (Tex.Crim.App.1985), I am bound to join the majority's decision to affirm appellant's conviction. I write separately to suggest the need for a reappraisal of the underlying rationale for the *Boutwell* exception to the inadmissibility of extraneous offenses.

Appellant was charged with the aggravated sexual assault of his twelve-year-old niece. The indictment alleged, and the complainant testified, that the assault occurred in December 1985. Over appellant's objection, the State elicited from complainant testimony that appellant had engaged in another act of intercourse with her during late October or early November 1985. This prior act allegedly occurred while appellant was babysitting complainant and her siblings during their parents' vacation in Nashville.

As a general rule, proof of prior specific acts of misconduct, similar happenings or extraneous transactions committed by a party, including extraneous offenses alleged to have been committed by a defendant, are not admissible in evidence. *Bates v. State,* 643 S.W.2d 939, 943 (Tex.Crim. App.1982); *Watson v. State,* 146 Tex.Cr.R. 425, 175 S.W.2d 423, 424 (1942). This rule is deemed fundamental and is followed in all jurisdictions. *Hafti v. State,* 416 S.W.2d 824, 825 (Tex.Crim.App.1967). One basis for the rule, as applied in criminal cases, is that the accused is entitled to be tried on the accusation made in the State's pleading and should not be tried for some collateral crime or for being a criminal generally. *Albrecht v. State,* 486 S.W.2d 97, 100 (Tex.Crim.App.1972); *Rodriguez v. State,* 486 S.W.2d 355, 358 (Tex.Crim.App. 1972). Further, evidence of an extraneous offense is inherently prejudicial because it influences the jury to convict the defendant on his propensity to commit crimes, which is not material or relevant to the charges against him, and which unfairly tries the defendant on charges of which he has no notice. *Sanders v. State,* 604 S.W.2d 108, 111 (Tex.Crim.App.1980). Consequently, evidence of extraneous offenses offends our system of justice and is inconsistent with due process. *Murphy v. State,* 587 S.W.2d 718, 721 (Tex.Crim.App.1979).

Texas courts have recognized numerous exceptions to the inadmissibility of extraneous offenses. *See, e.g., Albrecht,* 486 S.W.2d at 100–01. In *Boutwell,* the Court of Criminal Appeals recognized a "sort of 'res gestae' exception for cases involving sexual offenses." *Boutwell,* 719 S.W.2d at 174. Relying upon a line of cases commencing with *Battles v. State,* 63 Tex.Cr.R. 147, 140 S.W. 783, 786 (1911), the court held that extraneous transactions between a defendant and the complainant were admissible. *Boutwell,* 719 S.W.2d at 178.

Without critical analysis, the *Boutwell* court accepted the two-fold rationale for admissibility accepted in *Battles.* First, the testimony of other acts makes a child's accusation more plausible. *Boutwell,* 719 S.W.2d at 175; *Battles,* 140 S.W. at 787. Second, the extraneous offenses show circumstances that throw light upon the charged act, explaining the act by showing the dominant physical and emotional position of the accused over the complainant. *Boutwell,* 719 S.W.2d at 174–75; *Battles,* 140 S.W. at 787. An examination of the

*Battles* rationale shows that the court's reliance on *Battles* is perhaps unwise.

The first rationale given, that testimony of prior acts makes the charged act more plausible, is based upon a number of erroneous presumptions. First, it presumes that a child's testimony requires corroboration, and second, that extraneous offenses will serve this corroborative function.

In *Battles*, the court's premise was that the extraneous offenses were admissible because of the nature of such an unnatural, and at that time unpublicized, act. Society considered child sexual abuse so rare and despicable that it was inherently unbelievable, requiring considerable corroboration. The child was deprived of the deference ordinarily accorded to witnesses by the fact finder because she was testifying to something absolutely unbelievable. Since the *Battles* era, public awareness of child sexual abuse has increased considerably. *See* D. FINKELHOR, CHILD SEXUAL ABUSE 1 (1984). Today, a child alleging sexual abuse is not automatically disbelieved. In fact, many people believe such stories absolutely, considering the child incapable of fantasizing such occurrences.

Further, the belief that a child's testimony requires corroboration ignores recent studies negating the idea that child witnesses are less believable than adult witnesses. Research has shown that children are not less accurate in their perceptions than are adults, they do not have weaker memories, nor are they more suggestible or susceptible to influence than adults. In fact, research indicates that children may actually be able to recall some occurrences better than adults. *See Court Roundup: How Credible Are Children As Witnesses?*, 23 JUDGES' J. 1, 1 (Fall 1984).

If one accepts the premise that a child's testimony requires corroboration, one is faced with another problem. How does testimony from a child who is not worthy of belief corroborate other implausible testimony from that child? The *Boutwell* court recognizes that this is not true "corroboration," *Boutwell*, 719 S.W.2d at 178 n. 1, but the court does not give a satisfactory explanation for its contention that extraneous transaction testimony makes the charged offense more plausible.

The Court rejected the "propensity" rationale as a method for showing the likelihood that the accused committed the charged offense. The State argued that proof of prior acts proves the accused's lustful nature and his propensity to sexually assault children. The Court recognized that the propensity rationale was premised on the erroneous belief that sexual offenders are more likely to repeat their crimes than are other criminals. Recent studies show that sex offenders rate as one of the lowest recidivists among criminals. *Boutwell*, 719 S.W.2d at 178. Having removed the propensity rationale for increasing the credibility of child witnesses, and having considered further testimony as being as unbelievable as the child's previous testimony, the Court has left no logical rationale for allowing extraneous offense testimony to bolster the child witness.

The second explanation given for allowing extraneous evidence of sexual acts to be put before the jury is the "res gestae" exception. *Battles* explained it as follows:

> While it is true want of consent is wholly immaterial in a case of this sort, however, it might be that a story would sound unreasonble that a girl would willingly enter into this act of intercourse with a party in the absence of any circumstances showing familiarity or allurements preceding the act. We think this testimony was admissible as a circumstance to throw light upon the act of intercourse.

*Battles*, 140 S.W. at 787 (quoting *Rowan v. State*, 57 Tex.Cr.R. 625, 124 S.W. 668, 672 (1910)). The rationale seems based upon the assumption that the child is somehow at fault for allowing the rape unless there is proof that she was seduced by the accused. Society's perception of the victim of sexual assault has changed considerably since 1911. It is no longer a prevalent belief that the victim "asked for" the assault to happen, or that the victim is in any way culpable for allowing the assault to occur. By accepting the rationale of *Battles* that it is necessary to show that the

child's resistance was overcome by seduction or allurements, the *Boutwell* court is preserving the antiquated perceptions of the victim as being at fault.

It is clear, then, that the *Boutwell* exception is not founded on reasonable assumptions consistent with modern society. Nevertheless, it seems unlikely that the Court of Criminal Appeals will reconsider its position in *Boutwell.* The court justified the continued recognition of this sexual assault exception to the extraneous offense rule in part because of its purportedly narrow applicability. However, certain language in *Boutwell* fosters expansive use of the exception. The court states, "Ideally, as discussed, such evidence will be admissible ... where the extraneous transaction is relevant to a material issue. But, we also recognize the validity of the 'res gestae' or context exception established in *Battles.*" *Boutwell,* 719 S.W.2d at 178. The Court has stated, then, that extraneous offense testimony is admissible whether relevant to a material issue or completely irrelevant to any material issue. Further, by characterizing the exception as "res gestae," the court has guaranteed that the probative value will always outweigh the prejudicial effect. When extraneous offense evidence is offered in a criminal prosecution under the res gestae rationale, the prejudicial nature will rarely render it inadmissible. *See Lott v. State,* 695 S.W.2d 237, 240 (Tex.App.—Corpus Christi 1985, pet. ref'd); *see also Maddox v. State,* 682 S.W.2d 563, 566 (Tex.Crim.App.1985) (Clinton, J., concurring).

I would urge the court to reject the exception allowing extraneous offenses in sexual assault cases to be treated differently from extraneous offenses in other cases. Allowing extraneous offenses to be admitted only when relevant, and then only when the prejudicial effect is outweighed by the probative value, carefully balances the rights of the accused and the interest of the State in prosecuting offenders. Under this test, I would hold that the extraneous offense in the case *sub judice* is inadmissible because it was not relevant to a material issue in the case. I would further hold, however, that the error in admitting the

evidence was not so harmful that reversal is required. If appellant's alibi testimony had been stronger, there would be a danger that the jury had convicted appellant based upon the extraneous offense for which he had no alibi rather than for the charged offense. I would hold that the weakness of the alibi testimony makes it unlikely that appellant's conviction was for other than the charged offense.

Because of *Boutwell,* this balancing test is not required, and I must bow to the authority of the Court of Criminal Appeals and join the majority in affirming appellant's conviction.