IN THE COURT OF CRIMINAL APPEALS


OF TEXAS







NO. AP-74,398






JONATHAN MARCUS GREEN, Appellant



v.



THE STATE OF TEXAS






APPEAL FROM 


MONTGOMERY COUNTY






 Per curiam.



 In July 2002, a jury convicted appellant of a capital murder (1) committed in June 2000.
Pursuant to the jury's answers to the special issues in Code of Criminal Procedure Article
37.071, Sections 2(b) and 2(e), the trial court sentenced the appellant to death. Appeal to this
Court is automatic. (2) The appellant raises eight points of error, including challenges to the
sufficiency of the evidence at both stages of trial, a complaint about denial of his motion to
suppress evidence, and challenges to the jury charges at the guilt and punishment stages. We
affirm.

Background

 In June 2000, Victor Neal, who was separated from his wife Laura, lived in the small
community of Dobbin with his three daughters: sixteen-year-old Victoria, fifteen-year-old
Jennifer, and the victim, twelve-year-old Christina. On the evening of June 21, 2000, Victor and
Jennifer left home to get dinner for the family. Victoria and Christina said that they would eat
when they returned from a friend's house. The friend, Maria Jimenez, lived just down the street
from the Neal family. After Victor and Jennifer left, Victoria's boyfriend (and Maria's uncle),
Manuel Jimenez, came by the house to pick up the two girls. After driving around for a while, the
group went to Maria's house where they stood outside talking with Maria and her two brothers,
Martin and Jose. 

 While standing outside by the truck, Victoria and Christina began arguing. Victoria
walked away from the argument and toward Maria's house, leaving Christina and Jose outside.
Shortly thereafter, Jose told Victoria that Christina was angry and had left. When Victoria
returned home, she discovered that Christina was not there. 

 The next morning, Victor saw Jennifer and Victoria sleeping on the couch. He also
noticed that the door to the girls' bedroom was closed. Assuming Christina was asleep in the
bedroom, Victor left for work. When he got home about 3:00 or 4:00 p.m., Jennifer and Victoria
told him that Christina had never returned home the night before. Victor asked the girls to go to
Maria's house and tell Christina to come home. They found that Christina was not at Maria's
house. After learning about the argument between Christina and Victoria the night before, Victor
concluded that Christina had spent the night at another friend's house, and the family began
searching the neighborhood. Along the road near the Neal home, Victoria and Maria found
Christina's glasses. The glasses were "smashed and broken," but Victoria testified that Christina
had a habit of destroying her glasses when she got mad. Victor stopped looking for Christina
around 11:00 or 11:30 p.m.

 The next morning, Victor asked his sister, Tereza Goodwin, to look for Christina while he
was at work. Christina had run away before, so Victor told Tereza to report her as a runaway if
she could not find her. Later that day, having failed to locate Christina, Tereza reported her
missing to a Montgomery County Sheriff's deputy. Local law-enforcement officers then joined
the family in searching for Christina.

 On June 26, the FBI joined the search. On that same day, Jennifer and her mother found
what appeared to be Christina's panties at the edge of the woods across from the Neal home.
Also around this time, Victoria found Christina's bracelet and necklace along a pathway in the
woods. The search continued.

 On June 28, investigators spoke with the appellant, who lived in Dobbin. He said he had
no information concerning Christina's disappearance, and that he was either at home or at his
neighbor's house on the night she disappeared. He gave the investigators permission to search his
home and property, with the condition that he be present. Investigators performed a cursory
search of the house and property, but they noticed nothing significant.

 A few days later, investigators again asked the appellant his whereabouts on the night of
Christina's disappearance. Again, the appellant claimed to have been at home or at his neighbor's
house.

 On July 19, Manuel Jimenez, who lived on the property behind the appellant's, told
investigators that the appellant had an unusually large fire in his burn pile the day after Christina
disappeared. A few days later, investigators went to the appellant's home and asked if they could
search his property again, including his burn pile. The appellant again consented, but insisted that
he be present during the search. FBI agents Sue Hillard and Mark Young walked around the burn
pile with the appellant. Young pushed a metal probe into the ground to vent the soil and check
for any disturbances. When the probe sank three feet into the ground at one location, Young
determined that the ground had been disturbed or dug up in that area; he concluded that the
disturbed section covered a very large area. He also smelled a distinct odor emanating from the
disturbed section of ground which he identified as "some sort of decaying body." The investigation team then began to dig up the disturbed area. The appellant, who had been cooperative up to
that point, became angry and told the officers to get off his property.

 The investigative team returned to the appellant's property later that night with a search
warrant. They discovered that part of the burn pile had been excavated, leaving what appeared to
be a shallow grave. They also smelled the "extremely foul, fetid odor" of a "dead body in a
decaying state." When investigators asked the appellant what had happened at the burn pile, the
appellant said that he had dug the pit to show authorities that "there was no dead body in there."
An officer then arrived with a "cadaver dog," trained to detect human remains. As the dog was
walking to the burn pile, it alerted to the house. Upon entering the house, the dog repeatedly went
to the side of a recliner that was wedged into a corner of the room. Agent Hillard looked behind
the recliner and saw "a foot sticking out of the top of [a blue] bag" and what appeared to be
human remains. Before the discovery was announced, the appellant was overheard to say, "Those
Mexicans are setting me up" and "put a body in my house."

 The remains were identified as Christina's. The medical examiner, Dr. Joye Carter,
concluded from a ligature mark around Christina's neck that Christina was strangled. She also
determined that Christina's arms had been tied behind her back and that Christina had been
sexually assaulted before she died. She testified that the body had been wrapped in a blanket and
placed inside a blue bag.

 During the course of the autopsy, various materials were recovered from Christina's
body. Two black hairs that did not appear to be Christina's were found in her pubic area. Based
on the way Christina was positioned within the blanket, Carter determined that the hairs must
have been present before her body was wrapped in the blanket, and could not have been
transferred there afterward. Mitochondrial-DNA testing excluded 99.7% of the African-American population as a source of the hair. The appellant, an African-American, could not be
excluded from the remaining 0.3%. Carter also recovered a black cotton cloth from Christina's
mouth. The cloth was positioned in such a way that Carter determined, to a medical certainty,
that the cloth did not cause Christina's death.

 Criminalist Bradley Mullins from the Texas Department of Public Safety crime lab
testified that many of the fibers recovered from Christina's body matched fiber samples seized
from the appellant's property and residence. On the panties that were recovered near the Neal
home five days after Christina had disappeared and nearly a month before her body was found,
Mullins found a fiber that had characteristics identical to carpet in the appellant's residence. 


Sufficiency of the Evidence

 In his first two points of error, the appellant challenges the legal and factual sufficiency of
the evidence to support his conviction for capital murder. In his fifth, sixth, and seventh points of
error, the appellant challenges the legal and factual sufficiency of the evidence to support the
jury's affirmative finding as to the first special issue at punishment, and the factual sufficiency of
the evidence to support the jury's negative answer to the mitigation punishment question. We
address the appellant's points of error in turn. 

 In point of error one, the appellant asserts that the evidence is legally insufficient to
support the jury's verdict of guilt. In reviewing the legal sufficiency of the evidence, we look at
all of the evidence, both direct and circumstantial, in the light most favorable to the verdict to
determine whether, based on that evidence and reasonable inferences therefrom, a rational trier of
fact could have found the essential elements of the offense beyond a reasonable doubt. Jackson v.
Virginia, 443 U.S. 307 (1979); Ladd v. State, 3 S.W.3d 547, 556-57 (Tex. Cr. App. 1999), cert.
denied, 529 U.S. 1070 (2000). Furthermore, when the trial court's charge authorizes the jury to
convict on alternative theories, as it did in this case, the verdict of guilty will be upheld if the
evidence is sufficient on either of the theories. Rabbani v. State, 847 S.W.2d 555, 558-59 (Tex.
Cr. App. 1992), cert. denied, 509 U.S. 926 (1993).

 Here, the appellant was indicted for intentionally or knowingly causing the death of
Christina Neal while in the course of committing or attempting to commit kidnapping or
aggravated sexual assault. The appellant concedes that the "evidence is sufficient to support a
finding that Christina Neal was murdered and kidnapped." However, he asserts that the evidence
is not sufficient to prove beyond a reasonable doubt that he was the person who committed that
crime. Rather, he contends that the evidence only shows that Christina's body was recovered on
his property, and evidence that he hid or even moved the body is not indicative of whether he
murdered, kidnapped, or sexually assaulted her. He argues that an equally plausible explanation
is that someone else killed Christina and then hid her body on his property to divert suspicion
from the true perpetrator.

 The facts of the burial of the victim's body in the appellant's burn pile, and his exhumation and concealment of it after investigators asked to search his property again, are strong
evidence. The DNA in the hair that was left on the child's pubic area is strong evidence. The
fiber evidence that was found on the child's body and on the panties that were found long before
the body was found is further evidence.

 Given the totality of this evidence, we hold that a rational jury could have found beyond a
reasonable doubt that the appellant murdered Christina while in the course of kidnapping or
sexually assaulting her. The first point of error is overruled.

 The appellant's second point of error complains that the evidence is factually insufficient
to support his conviction for capital murder. He argues that the evidence that he committed the
offense "is no more than the presence of the body in his house, his refusal to consent to the
search of his property and his admission that he dug up the grave." The appellant claims that
"evidence of other persons who might be responsible for the crime was ample but not sufficiently
pursued by the State."

 In a factual sufficiency review, we view all the evidence in a neutral light and set aside
the verdict only if the evidence supporting the verdict is so weak or so against the great weight
and preponderance of contrary evidence as to render the verdict clearly wrong and manifestly
unjust. Goodman v. State, 66 S.W.3d 283, 285-86 (Tex. Cr. App. 2001); Johnson v. State, 23
S.W.3d 1, 11 (Tex. Cr. App. 2000). A clearly wrong and unjust verdict occurs where the jury's
finding is "manifestly unjust," "shocks the conscience," or "clearly demonstrates bias." Santellan
v. State, 939 S.W.2d 155, 164 (Tex. Cr. App. 1997).

 The appellant argues that there are several shortcomings in the State's evidence. First, the
appellant argues that the trace evidence of fibers and hairs found on Christina's body was "not
compelling because the body was found in his home, thus explaining why such fibers and hairs
might be found." Christina's body was wrapped in a blanket and then enclosed in a blue bag.
Only her foot was protruding from the wrappings when investigators discovered her body in the
appellant's house. Several pieces of trace evidence recovered from Christina's body, such as the
hair found in her pubic region and the fiber found on the cloth inside of her mouth, were found in
locations that made any incidental, post-mortem transfer extremely unlikely or impossible
according to the testimony of the medical examiner. Despite the appellant's assertion that there
"was no direct evidence of [his] involvement in the crime," this trace evidence connects him and
his home to the offense and to Christina prior to her death. 

 The appellant also asserts that numerous other fibers and hairs recovered from Christina
excluded him as a source. However, the record shows that the appellant was neither matched to
nor excluded as the sources for some items of trace evidence. The criminalist testified that just
because some pieces of hair, for example, have dissimilarities to the available sample, it does not
mean that the sample donor is excluded. In the testing of hairs, the appellant was excluded as the
source of only those hairs that matched Christina's hair or appeared to be animal hair. 

 The appellant further argues that "[s]omeone else, the real killer or his associates may
have moved the body or placed the body in his house to make [him] look suspicious" because if
"a person had killed Christina Neal, a plausible course of conduct would have been to place the
body in an area that would point to another suspect" such as himself. He asserts that an equally
plausible explanation of the crime is that someone else killed Christina, such as Abel Martinez,
who made statements about knowing the whereabouts of Christina's body, or Manuel Jimenez,
possibly to cover up an inappropriate relationship with Christina, and then hid her body on the
appellant's property to lead investigators to another suspect. However, investigators thoroughly
investigated Martinez and Jimenez and the evidence pointed away from them; all leads "were
completely handled [and] completely exhausted."

 The totality of the evidence presented at trial was neither so weak nor so against the great
weight and preponderance of contrary evidence that it rendered the verdict clearly wrong or
manifestly unjust. The second point of error is overruled.

 In his fifth point of error, the appellant claims that the evidence presented at trial was
legally insufficient to support the jury's finding that he would be a continuing threat to society. (3)
In reviewing the sufficiency of the evidence at punishment, we look at the evidence in the light
most favorable to the verdict to determine whether any rational trier of fact could have believed
beyond a reasonable doubt that the appellant would probably commit criminal acts of violence
that would constitute a continuing threat to society. Allridge v. State, 850 S.W.2d 471 (Tex. Cr.
App. 1991), cert. denied, 510 U.S. 831 (1993). The facts of the crime alone can be sufficient to
support the affirmative finding to the special issue. Id., at 488. 

 In addition to the facts of the crime in the instant case, the State presented evidence
showing the appellant's history of violent behavior. Mica McCoy testified that the appellant
raped her approximately four years before the trial in the instant case. She told the jury that she
had encountered the appellant late one night while walking down a dirt road in Dobbin. The
appellant dragged her to his property, pushed her down to the ground, placed her in a choke hold,
and forced his fingers down her throat causing her to vomit. He told her that he would kill her
and break her neck if she screamed. Once the appellant had her pinned down, he ripped off her
clothes and raped her. Although McCoy escaped, she never reported the rape because she had an
outstanding arrest warrant.

 Josie Jimenez testified that in July 1999, the appellant entered her home without
permission, jumped on top of her, and demanded that she have sex with him. Jiminez tried to
defend herself, but the appellant forced himself on her. She reported the offense to the police and
was taken to Conroe Medical Center. When the case appeared before the grand jury, Jiminez was
too afraid of the appellant to appear. Jiminez also testified about another time when the appellant
tried to rape her. However, on that occasion, she was armed with a pocket knife and was able to
fend him off.

 In January 2000, a pony was stolen from Erin Irby's pasture in Dobbin. On February 6,
2000, the pony was found stabbed to death in a wooded area near the appellant's home. A bloody
pair of shears and a bloody broken butcher knife were laying near the pony's carcass. The pony
was tied to a tree and there was a worn track around the tree where the animal had apparently
circled for some time before being killed. When questioned, the appellant admitted that the
shears were his but claimed that they had been stolen a few weeks earlier. The only print
recovered from the shears matched the appellant's left middle finger.

 The appellant also displayed increasingly violent behavior while he was incarcerated in
the Montgomery County Jail. On the morning of September 9, 2000, the appellant threatened to
assault an officer for taking a toothbrush and a bowl of food from him. On February 5, 2001, the
appellant threatened a fellow inmate asserting that he "would make his heart stop." On another
occasion, the appellant threatened a deputy because he would not give him a second glass of
juice. On July 26, 2001, the appellant assaulted and robbed another inmate. On March 13, 2002,
the appellant assaulted an officer in the jail. Finally, the appellant had a misdemeanor conviction
for unlawfully carrying a weapon. 

 Given this evidence, a rational jury could have concluded that the appellant would
continue to be a threat to society. Accordingly, we hold that the evidence is legally sufficient to
support the jury's affirmative answer to the future-dangerousness issue. Allridge, 850 S.W.2d, at
471. Point of error five is overruled.

 In his sixth point of error, the appellant argues that the evidence is factually insufficient to
sustain the jury's affirmative answer to the future-dangerousness punishment question. In
McGinn v. State, we determined such a review is not constitutionally required and refused to
review the evidence on the punishment issues in capital cases for factual sufficiency. 961 S.W.2d
161 (Tex. Cr. App.), cert. denied, 525 U.S. 967 (1998). The appellant has not persuaded us to
revisit this holding. Point of error six is overruled.

 In his seventh point of error, the appellant argues that the evidence is factually insufficient to sustain the jury's negative answer to the mitigation punishment. (4) We do not review the
sufficiency of the evidence to support a jury's negative answer to the mitigation issue. Allen v.
State, 108 S.W.3d 281, 285 (Tex. Cr. App. 2003), cert. denied, 72 U.S.L.W. 3536 (U.S. Feb. 23,
2004). The appellant has not persuaded us to revisit this holding. Point of error seven is overruled.

Motion to Suppress Evidence


 In his third point of error, the appellant argues that the trial court erred when it "denied
[his] motion to suppress." In support of his argument, the appellant advances four separate
claims:

 (1) The "initial search" of appellant's property was illegal, thus the State's
discovery of the burn pile behind appellant's house should be suppressed;


 (2) The search warrant was issued without probable cause to believe that any
contraband or evidence of a crime was on the premises; 


 (3) The warrant was invalid in scope because there was no probable cause to
believe that there was any evidence or contraband in appellant's home; and


 (4) The affidavit and search warrant failed to adequately describe the place to be
searched.


We shall address each part of the appellant's argument in turn.

 The first claim the appellant asserts under his third point of error is that the initial search
of his property by Detective Gay was without a warrant and without consent. This claim is
different from the claim in his motion to suppress, which alleged that (1) the affidavit upon
which the search warrant was based was improperly and illegally executed, and (2) that the
search and seizure was illegal in that the search warrant was facially deficient because the search
warrant failed to specify the place to be searched. Because the appellant never advanced the
argument that the initial search by Gay was without a warrant and without consent either in his
motion to suppress or in the hearing on his motion to suppress, he has failed to meet the
prerequisite for presenting the claim for appellate review. See Rule of Appellate Procedure
33.1(a).

 The appellant's second complaint is that the affidavit supporting the search warrant failed
to establish probable cause. He asserts that there was "no reason to believe the missing child was
ever on [his] property and [n]o connection was drawn between [him] and the child." In considering a trial court's ruling on a motion to suppress evidence, an appellate court must uphold the
ruling if it is reasonably supported by the record and is correct under any theory of law applicable
to the case. State v. Steelman, 93 S.W.3d 102, 107 (Tex. Cr. App. 2002); Romero v. State, 800
S.W.2d 539, 543-44 (Tex. Cr. App. 1990). Whether the facts alleged in a search warrant
affidavit are sufficient to support a search warrant is determined by a totality of the circumstances. Ramos v. State, 934 S.W.2d 358, 363-64 (Tex. Cr. App. 1996), cert. denied, 520 U.S.
1198 (1997). The affidavit must allege sufficient facts to establish probable cause to believe that
the items will be found at the designated place. Massey v. State, 933 S.W.2d 141, 148 (Tex. Cr.
App. 1996). The question is whether the allegations "justify a conclusion that the object of the
search is probably on the premises." Ramos, 934 S.W.2d, at 364. The issuing magistrate is
permitted to draw reasonable inferences and the reviewing court should accord great deference to
the magistrate's determination. Id.

 The affiant, Don Gay, stated in the search warrant affidavit that he believed that a
"[k]idnapping and/or [m]urder" had been committed and that the following items could be found
at the appellant's place and on his premises: (1) bones; (2) bone fragments; (3) human tissue; (4)
clothing; (5) shoes; (6) jewelry; or (7) any other evidence of human remains or any other personal
objects that might belong to a human being. The affiant made the following (paraphrased) factual
allegations in the search warrant affidavit: 

 (1) Christina Neal, a 12-year-old child, was last seen on Wednesday, June 21, 2000, at
approximately 11:00 p.m. walking in her neighborhood on Second Street; 

 

 (2) the Neal family resided at 207 Second Street, Dobbin, Montgomery County, Texas; 

 

 (3) on June 23, 2000, Christina's family called the Montgomery County Sheriff's Office
to report that Christina was missing; 

 

 (4) on Wednesday, July 19, 2000, F.B.I. Agent Sue Ellen Hillard interviewed Manuel
Jimenez, who lives in a residence behind the appellant; 

 

 (5) Jimenez told Hillard that on Thursday, June 22, 2000, when Jimenez returned home
from work sometime after 6:00 p.m., he saw the appellant burning a large fire in his own
backyard; 

 

 (6) Jimenez recalled the fire because he was afraid it might spread to his property; 


 (7) Jimenez told Hillard that the appellant rarely burned anything in his backyard and had
never burned a fire that large; 

 

 (8) the appellant's residence is approximately one-half mile from the Neal residence; 

 

 (9) Christina was known to have frequently visited the Jimenez residence; 

 

 (10) on July 21, 2000, at approximately 7:10 a.m., F.B.I. Agent Justin G. Fox and the
affiant went to the appellant's residence and asked him for consent to search his property; 

 

 (11) the appellant gave the affiant and Fox verbal consent to search the property, including the burn pile;

 

 (12) F.B.I. Agents Hillard and Young arrived on scene to assist with the search at
approximately 7:30 a.m.; 


 (13) using a metal probe, Young found that the earth beneath the burn pile, based on his
experience and training, was normal based on the depth and density of the earth (the
probe sank approximately one foot into the ground); 

 

 (14) when Young inserted the probe into the ground area immediately to the north of the
burn pile, it sank approximately four feet into the ground, indicating that the earth in the
immediate area had recently been disturbed; 

 

 (15) Young also smelled a foul odor in this area which Hillard also noticed; 

 

 (16) when the agents went to get their shovels and equipment to process the area, the
appellant told them that he did not want them messing up his property; 

 

 (17) the appellant specifically told them that he did not want them digging "there,"
indicating the area where the foul odor had been noticed; 

 

 (18) when Hillard asked the appellant if he had buried anything there, he said that he had
buried a bulldog there; 


 (19) when Hillard asked the appellant when he had buried the dog, the appellant said that
he "threw [the] dog out in the woods a couple of years ago"; 


 (20) based on his experience and training, Young believed that the odor was not consistent with a dog's being buried over two years ago.


From these facts, the magistrate reviewing the affidavit could have reasonably inferred that the
appellant knew or at least was familiar with Christina. She could also have reasonably inferred
from the appellant's building of an unusually large fire that he was trying to dispose of something
fairly large. This was especially true given that he rarely burned anything and a soft area of earth
was discovered next to the burn pile. Given the foul odor, the affiant's reference to Young's
"experience and training," Hillard's question about whether the appellant had buried something
in the recently disturbed area, and the appellant's response to that question, the magistrate could
have reasonably determined that the appellant had buried a recently deceased body in that area.
Finally, the magistrate could have inferred from the appellant's evasiveness and resistance to
allowing the authorities to dig in that specific area, that he was trying to hide evidence of a crime
from the authorities.

 Given the facts and the reasonable inferences the issuing magistrate was allowed to draw
therefrom, we cannot say that the magistrate was outside the zone of reasonable disagreement in
determining that the affidavit contained sufficient probable cause to support the issuance of the
search warrant. Ramos, 934 S.W.2d, at 364.

 In the third part of his argument, the appellant argues that, even if there were probable
cause to search the area of his burn pile, "the search of the house was nevertheless improper"
because the affidavit in support of the warrant "made no suggestion that there was any belief that
there was contraband or evidence of a crime within [his] home." As with the first part of his
argument, appellant never advanced this claim in his motion to suppress or in the hearing on his
motion to suppress. Therefore, it is not preserved for our review.

 Finally, in the fourth part of his argument, the appellant claims that the affidavit and
search warrant failed to adequately describe the place to be searched. All that is required in
describing a place to be searched is that there be sufficient definiteness in the description to
enable an officer to locate the property and distinguish it from other places in the community.
Etchieson v. State, 574 S.W.2d 753, 759 (Tex. Cr. App. 1978), cert. denied, 440 U.S. 936 (1979).
The description in the search warrant and supporting affidavit of the place to be searched was as
follows:

 A white wood frame single story house on blocks surrounded by a chain link
fence, with a front door and four windows on the front facade, immediately west
of a mobile home and east of a private cemetery. The residence is located on an
un-named dirt road approximately .2 miles North of Highway 105 and .2 miles
East of the U.S. Post Office in Dobbin, Texas, a location within Montgomery
County. The residence is known to be the residence of [the appellant].

 

This description was sufficient to allow officers to find the location on a map and to specifically
distinguish this house from the surrounding residences.

 The trial court did not abuse its discretion in overruling the appellant's motion to
suppress evidence. Point of error three is overruled. 

Jury Charge at Guilt Stage

 In his fourth point of error, the appellant claims that "the trial court committed egregious
error in the jury charge because it failed to require a unanimous verdict to convict" him.
Specifically, the appellant claims that the trial court's "instructions allow[ed] for a less than
unanimous verdict on the aggravating element" because two alternative theories of capital
murder were charged in the disjunctive; the charge allowed the jury to convict the appellant of
murder in the course of kidnapping or murder in the course of aggravated sexual assault.

 In Kitchens v. State, this Court held that when the jury is charged with alternative theories
of committing the same offense, it is appropriate for the jury to return a general verdict if the
evidence is sufficient to support a finding under any of the theories submitted. 823 S.W.2d 256,
258 (Tex. Cr. App. 1991), cert. denied, 504 U.S. 958 (1992). The appellant acknowledges our
holding in this case but argues that the recent United States Supreme Court cases of Apprendi v.
New Jersey, 530 U.S. 466 (2000), and Ring v. Arizona, 536 U.S. 584 (2002), require this Court to
reevaluate our prior holding.

 When a defendant is on trial for capital murder, and the State has announced its intention
to seek the death penalty, the prescribed statutory maximum punishment is death. Apprendi and
Ring both address issues that increase the statutory maximum punishment. A defendant found
guilty of murder committed in the course of committing or attempting to commit kidnapping is
just as subject to receiving the statutory maximum punishment of death as is a defendant found
guilty of murder committed in the course of committing or attempting to commit aggravated
sexual assault. Apprendi and Ring, therefore, do not apply. See Rayford v. State, 125 S.W.3d 521
(Tex. Cr. App. 2003) (holding that Apprendi and Ring have no applicability to Code of Criminal
Procedure Article 37.071, the capital murder sentencing statute, in its current form). Point of
error four is overruled.

Jury Charge at Punishment Stage


 Finally, in his eighth point of error, the appellant argues that "the trial court committed
egregious error in failing to properly instruct the jury of the law at the punishment phase." In
particular, the appellant complains that the trial court should have defined the following words
and phrases: mitigate, militate, moral blameworthiness, probability, criminal acts of violence,
and continuing threat. He also claims that the judge erred in failing to include in the jury charge a
burden of proof on the mitigation special issue. These issues have been previously raised in, and
rejected by, this Court. See, e.g., Blue v. State, 125 S.W.3d 491(Tex. Cr. App. 2003) (holding
that the term "moral culpability" need not be defined); Resendiz v. State, 112 S.W.3d 541,
549-50 (Tex. Cr. App. 2003) (holding that if there is no statutory definition of a term, the trial
court is not obligated to define the term when it "has such a common and ordinary meaning that
jurors can be fairly presumed to know and apply such meaning" and rejecting the claim that the
mitigation special issue is infirm as a matter of federal constitutional law because it omits a
burden of proof); Chamberlain v. State, 998 S.W.2d 230, 237-38 (Tex. Cr. App. 1999) (holding
that the trial court did not err in failing to define "probability," "criminal acts of violence," and
"continuing threat to society"), cert. denied, 528 U.S. 1082 (2000). Point of error eight is
overruled.

 We affirm the judgment of the trial court.


En banc.

Delivered: December 1, 2004.

Do Not Publish.
1. See Tex. Penal Code § 19.03(a)(2).
2. See Tex. Code Crim. Proc. art. 37.071, § 2(h).
3. See Tex. Code Crim. Proc. art. 37.071, § 2(b)(1).
4. See Tex. Code Crim. Proc. art. 37.071, § 2(b)(1).